# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PRESBYTERIAN HEALTHCARE SERVICES
and NEW MEXICO HOSPITAL EQUIPMENT
LOAN COUNCIL,

      Plaintiffs,

vs.                                                                          No. CIV 14-0181 JB/SCY

GOLDMAN, SACHS & CO.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Goldman, Sachs & Co.'s Motion to Transfer Pursuant to 28 U.S.C. § 1404(a), filed September 30, 2014 (Doc. 27)("Motion").  The Court held a hearing on March 5, 2015.  The primary issue are: (i) whether Plaintiff Presbyterian Healthcare Services' claims 'arise out of' its broker-dealer agreement with Defendant Goldman, Sachs & Co., Broker-Dealer Agreement, filed September 30, 2014 (Doc. 29-1); and (ii) whether Presbyterian Healthcare Services' claims "arise out of" its Broker-Dealer Agreement, Presbyterian Healthcare would be bound by the Broker-Dealer Agreement's forum-selection clause, requiring that Presbyterian Healthcare bring its case in the United States District Court for the Southern District of New York.  The Court concludes that Presbyterian Healthcare's claims 'arise out of' the Broker-Dealer Agreement, because the claims concern Goldman Sachs' actions pursuant to that agreement.  The Court therefore grants Goldman Sachs' Motion and will transfer this case to the United States District Court for the Southern District of New York.

### FACTUAL BACKGROUND

Presbyterian Healthcare is a private, non-profit healthcare system based in Albuquerque, New Mexico. <u>See</u> Complaint for Declaratory Relief and Injunctive Relief ¶ 4, at 2, filed February 25, 2014 (Doc. 1)("Complaint"). The New Mexico Hospital Equipment Loan Council ("NMHELC") is a state-created, <u>see</u> N.M. Stat. Ann. § 58-23-5 NMSA, but independently-run instrumentality, Complaint ¶ 5, at 2, that assists New Mexico hospitals in issuing bonds, <u>see</u> Transcript of Defendant Goldman, Sachs & Co.'s Motion to Transfer at 38:17-19 (taken Mar. 5, 2015)("Tr.")(Edwards). Goldman Sachs is a multinational investment banking firm based in New York City, New York. <u>See</u> <u>About Goldman Sachs</u>, Goldman Sachs, http://www.goldmansachs.com/who-we-are/at-a-glance/index.html (last visited July 7, 2015).

From 2004 to 2009, Goldman Sachs provided financial services to Presbyterian Healthcare. <u>See</u> Complaint ¶ 11, at 4. In 2004, Goldman Sachs helped Presbyterian Healthcare issue roughly $147.5 million in Auction Rate Security ("ARS") bonds. Memorandum of Law in Support of Goldman, Sachs & Co.'s Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) at 2, filed September 30, 2014 (Doc 28)("Motion Memo."). ARS bonds are

> long-term, variable-rate instruments with interest rates that reset at periodic auctions. At each auction, ARS investors submit a bid setting forth the number of ARS that they wish to purchase, hold, or sell, and the lowest interest rate that they will accept. The lowest interest rate at which the entire issue can be sold at par establishes the new interest rate to be paid until the next auction. This new interest rate is known as the "clearing rate." If there are insufficient bids to cover the bonds available for sale at the auction, however, the auction "fails," and the interest rate is set at a contractual "maximum rate" until the next auction.

<u>Goldman, Sachs & Co. v. City of Reno</u>, 747 F.3d 733, 736 (9th Cir. 2014). Ideally, ARS bonds allow the issuer to offer long-term debt while paying interest rates comparable to short-term debt. <u>See</u> Complaint ¶ 12, at 4. The ARS market is vulnerable, however, to auction failure:

when there are more ARS bonds than bidders, the issuer is penalized by having to pay a set maximum interest rate.  See Motion Memo. at 3.

In 2006, Presbyterian Healthcare wished to capitalize on a favorable shift in long-term municipal debt interest rates, and Goldman Sachs arranged to "synthetically fix" the ARS bond rate by having Presbyterian Healthcare enter into interest rate swaps with a Goldman Sachs affiliate.  Complaint ¶ 13, at 4-5.  Under these swaps, Presbyterian Healthcare paid the affiliate a fixed rate in exchange for variable rate payments based on the monthly London Interbank Offer Rate ("LIBOR").  Complaint ¶ 13, at 5.  The parties expected the LIBOR rate to mirror the rates Presbyterian Healthcare would have had to pay on its ARS bonds, allowing Presbyterian Healthcare to continue to pay a fixed rate while continuing to send its ARS bonds to auction. See Complaint ¶ 13, at 5.  In early 2008, demand for ARS bonds dropped, and auctions across the country began to fail.  See Motion Memo. at 5.  Presbyterian Healthcare had to restructure many of its ARS bonds, terminate some of its interest rate swaps, and pay higher rates.  See Complaint ¶ 17, at 6.

**1.      The Parties' Agreements and Relevant Documents.**

Presbyterian Healthcare and Goldman Sachs began discussing investment banking services in late 2003, see Plaintiffs' Opposition to Defendant's Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) at 15, filed November 24, 2014 (Doc. 35)("Response"), culminating in the issuance of ARS bonds in mid-2004, Response at 3.  The parties now contest the legal implications of several documents and agreements created during that time.

**a.      Goldman Sachs' Proposal.**

In late 2003, Goldman Sachs sent Presbyterian Healthcare a proposal pitching its banking and underwriting services.   See Proposal to Provide Investment Banking Services, filed

November 24, 2014 (Doc. 35-2)("Proposal"); Edwards Decl. ¶ 3, at 1.  The Proposal touts Goldman Sachs' experience working with health care providers, see Proposal at 3, asserting that it "is a leader and innovator in . . . capital formation, underwriting[,] remarketing[,] auction agent/broker-dealer services[,] derivative product development and execution[,] strategic advisory services[,] and use of credit enhancement," Proposal at 4.  Goldman Sachs also underscores its long-term commitment to clients:

> Goldman Sachs prides itself on providing complete, broad based, intensive coverage for our clients, regardless of where they are in their capital cycle.  While we have recently added a number of new clients, many of our relationships span decades.  We maintain these relationships by providing a complete and varied range of services, by being a product innovator and market leader, and by focusing on what is best for the client rather than what produces the next trade.

Proposal at 3.

### b.      **The Purchase Contract**.

On May 7, 2004, Goldman Sachs entered into an agreement with the NMHELC to purchase Presbyterian Healthcare's ARS Bonds and serve as the underwriter.  See Purchase Contract at 1,[2] dated May 7, 2004, filed September 30, 2014 (Doc. 29-4).  The Purchase Contract contains no forum-selection clause, but stipulates that New Mexico law governs the contract. See Answer ¶ 23, at 17.

### c.      **The Broker-Dealer Agreement**.

On May 12, 2004, Presbyterian Healthcare, Goldman Sachs, and Wells Fargo Bank entered into the Broker-Dealer Agreement, which setting terms for issuing four categories of

---

[2]In citing to the Purchase Contract, the Court will use the document's internal pagination, which appear on the bottom of the page, rather than the pagination that the CM/ECF system places on the upper right-hand corner of the page.

ARS bonds.[3]  See Broker-Dealer Agreement at 2.[4]  The Broker-Dealer Agreement stipulates to

the parties' procedures and expectations in executing the ARS bonds, see Broker-Dealer

Agreement at 3-6, 8, and sets compensation terms, see Broker-Dealer Agreement at 7-8.  The

Broker-Dealer Agreement includes a merger clause, titled "Entire Agreement," which reads:

> This Broker-Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the Series 2004 Auction Bonds, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings, oral, written or inferred, between the parties relating to the subject matter hereof.

Broker-Dealer Agreement at 14 (emphasis added).  A page later comes a forum-selection clause,

titled "Governing Law; Jurisdiction; Waiver of Trial by Jury":

> This Broker-Dealer Agreement shall be governed by and construed in accordance with the laws of the State of New York (including, without limitation, Section 5-1401 of the New York General Obligations Law or any successor to such statute).  The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court.  Each of the parties hereto also irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of this Broker-Dealer Agreement or the transactions contemplated hereby.

Broker-Dealer Agreement at 14 (emphasis added).

> **d.**     **FINRA Agreement.**

FINRA members must ostensibly adhere to its Code of Arbitration Procedure for

Customer Disputes ("FINRA Code"), Rule 12200 of which provides:

---

[3]$38,665,000 in "Series 2004A" bonds, $38,665,000 in "Series 2004B" bonds, $44,405,000 in "Series 2004C" bonds, and $25,720,000 in "Series 2004D" bonds.

[4]In citing to the Broker-Dealer Agreement, the Court will use the document's internal pagination, which appear on the bottom of the page, rather than the pagination that the CM/ECF system places on the upper right-hand corner of the page.

Parties must arbitrate the dispute under the Code if:

- Arbitration under the Code is either:

    (1) Requested by a written agreement, or

    (2) Requested by the customer

- The dispute is between a customer and a member or associated person of a member; and

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Code Arb. Proc. 12200.

## PROCEDURAL BACKGROUND

On February 10, 2014, Presbyterian Healthcare filed a claim against Goldman Sachs with the Financial Industry Regulatory Authority ("FINRA")[5] Division of Arbitration in New Mexico. See Declaration of Samuel B. Edwards in Support of Plaintiffs' Complaint for Declaratory Relief and Injunctive Relief ¶ 2, at 1, executed on February 25, 2014, filed on February 25, 2014 (Doc. 1-2)("Edwards Decl."). The claim alleged that Goldman Sachs misrepresented the stability of the ARS market, artificially supporting the market with its own bids "to create the illusion of sufficient bidders when they did not exist," which "hid the true and increasing risk" of Presbyterian Healthcare's bonds. Edwards Decl. ¶ 7, at 3. The claim further alleged that Goldman Sachs and other firms ceased supporting the ARS market in early 2008, causing the market collapse and Presbyterian Healthcare to suffer considerable financial loss. See Edwards Decl. ¶ 8, at 3.

---

[5]FINRA is a non-governmental agency that regulates the securities industry. See About FINRA, FINRA, https://www.finra.org/about (last visited Aug. 10, 2015).

The claim asserted eight counts: (i) violations of FINRA and Municipal Securities Rulemaking Board[6] rules; (ii) violation of securities statutes, namely provisions of the New Mexico Uniform Securities Act, see N.M. Stat. Ann. § 58-13C, including a provision concerning securities fraud, N.M. Stat. Ann. § 58-13C-501; (iii) negligent misrepresentations; (iv) breach of fiduciary duty; (v) fraud; (vi) negligence; (vii) unjust enrichment; and (viii) violations of New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 NMSA.  See Statement of Claim, ¶¶ 54-89, at 22-28,[7] filed September 30, 2014 (Doc. 26-1)("FINRA Claim").  Presbyterian Healthcare requested eleven categories of damages:

(1)    All sums paid to Goldman Sachs Mitsui Marine Derivative Products, L.P.[8] under the 2006 Swap Agreements; plus, additionally or alternatively,

(2)    The cost of unwinding the 2006 Swap Agreements; plus, additionally or alternatively,

(3)    All sums paid by Claimants over and above the synthetic fixed rate to service the 2005 ARS Bonds; plus, additionally or alternatively,

---

[6]Municipal Securities Rulemaking Board is a regulatory organization that "establishes rules that securities firms, banks and municipal advisors must follow when engaging in municipal securities transactions and advising investors and state and local governments."  See Rules and Interpretations, MSRB, http://www.msrb.org/Rules-and-Interpretations.aspx (last visited Aug. 12, 2015).

[7]In citing to the FINRA Claim, the Court will use the document's internal pagination, which the Plaintiffs place on the bottom of the page, rather than the pagination that the CM/ECF system places on the upper right-hand corner of the page.

[8]Goldman Sachs Mitsui Marine Derivative Products, L.P. is a joint venture between Goldman Sachs and Mitsui Sumitomo Insurance Company.  See Alastair Marsh, Goldman Sachs Offers Triple-Recourse Bonds Targeting AAA Buyers, Bloomberg, June 24, 2014, http:///www.bloomberg.com/news/articles/2014-06-25/goldman-sachs-offers-triple-recourse-bonds-targeting-aaa-buyers, last visited Aug. 14, 2015.

(4)    All incurred and future financing costs of the refinanced 2004 ARS Bonds over and above the bargained for synthetic fixed rate to service the 2004 ARS Bonds; plus, additionally or alternatively,

(5)    All advisory fees, closing fees, underwriting fees and other fees and expenses incurred by Claimants in connection with the 2004 ARS Bonds, the 2006 Swaps and the 2008 Bonds; plus, additionally or alternatively,

(6)    Rescission of any or all transactions as sought; plus, additionally or alternatively,

(7)    Statutory damages as provided by applicable law; plus, additionally or alternatively,

(8)    Pre-award and pre-judgment interest on all damages from the date of the initial transaction until the date of the award and/or judgment and until such sums are paid, all at the highest rate allowed by law; plus, additionally or alternatively,

(9)    All costs of these proceedings and for recovery of damages incurred, including legal fees, including while on appeal, if any, and for collection; plus, additionally or alternatively,

(10)   Punitive damages; plus, additionally or alternatively,

(11)   Any and all other relief available to Claimants, in law or equity or otherwise, which may be granted to them by this Arbitration Panel.

FINRA Claim at 29.

About a month after Presbyterian Healthcare filed the FINRA Claim, the parties agreed to stay the arbitration proceedings so that Goldman Sachs could "challenge the arbitrability of this matter and to file a preliminary injunction motion before a federal district court."  Letter from Goldman Sachs to FINRA, at 2, filed September 30, 2014 (Doc. 26-6).

Presbyterian Healthcare filed the Complaint in early 2014, asking the Court to "declare that the parties' dispute is arbitrable under FINRA Rules and issue an order compelling Defendant to submit to FINRA arbitration."  Complaint ¶ 3, at 2.  Presbyterian Healthcare asserts that this action is necessary, because "Goldman Sachs has filed suit seeking to enjoin every, or

virtually every, other suit brought by a municipal issuer similarly situated to [Presbyterian Healthcare]."  Complaint ¶ 28, at 10.

Presbyterian Healthcare asserts that it hired Goldman Sachs "as a strategic capital adviser wherein Goldman Sachs would provide ongoing advice concerning 'capital planning, credit strategy, rating agency and investor relations, rating agency and investor relations, raising capital, capital markets/derivatives implementation, and strategic advisory services.'"  Complaint ¶ 11, at 4.  Presbyterian Healthcare asserts that during their "ongoing business relationship" between 2005 and 2008, Goldman Sachs advised Presbyterian Healthcare on "at least four different bond issues and at least two different series of derivative transactions."  Complaint ¶ 3, at 4.  Presbyterian Healthcare asserts that, in 2006, it was considering ways to take advantage of advantageous interest rates on long-term municipal debt, and Goldman Sachs recommended that, "[r]ather than refund the 2004 ARS Bonds," Presbyterian Healthcare "synthetically fix" the 2004 bonds' rates by entering four interest rate swaps with a Goldman Sachs affiliate.  Complaint ¶ 13, at 4-5.  By paying a fixed rate to the affiliate in exchange for variable-rate payments based on LIBOR floating rate, Presbyterian Healthcare expected its debt obligation to comprise only the fixed rate, because the LIBOR rate would "closely mirror" the rate Presbyterian Healthcare owed to its bondholders.  Complaint ¶ 13, at 5.  Presbyterian Healthcare asserts that this plan did not go smoothly: "[U]nbeknownst to [Presbyterian Healthcare], from the time of the issuance of the 2004 ARS Bonds through early 2006, when the [s]waps were being considered, the ARS market had deteriorated significantly," and Goldman Sachs often had to artificially prop up the market by placing "support bids" that "creat[ed] the illusion of sufficient bidders when they did not exist."  Complaint ¶ 15, at 5-6.  Presbyterian Healthcare asserts:

> Goldman Sachs' conduct in the ARS market, and its lack of disclosure about the true state of the ARS market served to hide the true and increasing risk of the

2004 ARS Bonds, and subsequently the [s]waps, from [Presbyterian Healthcare]. Additionally, during this same time period, the Securities & Exchange Commission was investigating Goldman Sachs and other firms for their role in manipulating the ARS market.  Without proper disclosure of the increasing fail risk associated with the 2004 ARS Bonds, [Presbyterian Healthcare was] deprived of the necessary and material information to understand and evaluate the true risk and cost of entering the [interest rate s]waps.  Moreover, Goldman Sachs' continued lack of disclosure as the ARS market further deteriorated in the latter part of 2005 and 2007, deprived [Presbyterian Healthcare] of the opportunity to take action to protect themselves against an ARS market disruption or collapse.

Complaint ¶ 16, at 6.  Presbyterian Healthcare asserts that, when Goldman Sachs and other banking firms "abandoned the ARS market, . . . the ARS market quickly collapsed," and it "had to restructure the 2004 ARS Bonds at a significant cost, terminate some of the Swaps and continue to be damaged through the payment of elevated rates on the restructured debt and payments on the remaining Swaps."  Complaint ¶ 17, at 6.

Presbyterian Healthcare contends that it has a right arbitrate with Goldman Sachs under the FINRA Code of Arbitration, because Goldman Sachs is a member of FINRA, and because Presbyterian Healthcare is Goldman Sachs' customer.  See Complaint ¶¶ 19-28, at 7-10. Presbyterian Healthcare argues that it is a "customer" for FINRA Rule 12200 purposes, because "[a] number of federal courts around the country have held that an issuer of securities is the customer of its underwriter."  Complaint ¶ 22, at 8.  Presbyterian Healthcare cites Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400 (3d. Cir. 1987), abrogated on other grounds by Delgrosso v. Spang & Co., 903 F.2d 234, 236 n.2 (3d Cir. 1990), which upheld a district court's order compelling an underwriter to arbitrate at the National Association of Securities Dealers (n/k/a FINRA), noting that the NASD had previously stated: "An issuer of securities should be considered a public customer of a member firm where a

dispute arises over a proposed underwriting."[9]  819 F.2d at 406 (quoting NASD Annual Meeting 1983, Joint Appendix at 149)(internal quotation marks omitted).  Presbyterian Healthcare argues that, since Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc., the Southern District of New York "has twice ruled that an issuer-underwriter relationship by itself is sufficient to establish a FINRA claimant's customer status."  Complaint ¶ 23, at 8.  For example, Presbyterian Healthcare asserts that, in UBS Financial Services Inc. v. West Virginia University Hospitals Inc., 760 F. Supp. 2d 373 (S.D.N.Y. 2011)(Marrero, J.)("W. Va. Univ. Hosp."), aff'd in part and vacated in part, 660 F.3d 643 (2d Cir. 2011), Presbyterian Healthcare asserts that the court "specifically addressed the question of whether a municipal auction rate securities issuer was the customer of the underwriter of its auction rate bonds . . . [,] finding that . . . the ambiguities in the meaning of 'customer' should be resolved in favor of arbitration."  Complaint ¶ 24, at 9 (citing 760 F. Supp. 2d at 378).  Presbyterian Healthcare also points to a case from the United States Court of Appeals for the Fourth Circuit which affirmed a district court's ruling that a municipal auction rate issuer was its underwriter's and broker-dealer's customer, because "customer" under FINRA "'refers to one, not a broker or a dealer, who purchases commodities or services from a FINRA member in the court of the member's business activities insofar as those activities are regulated by FINRA -- namely investment banking and securities business activities.'" Complaint ¶ 26, at 9 (quoting UBS Fin. Servs. Inc. v. Carilion Clinic, 706 F.3d 319, 327 (4th Cir. 2013)(Niemeyer, J., joined by Keenan & Diaz, JJ.)("Carilion").  Presbyterian Healthcare also refers to a case from a district court within the United States Court of Appeals

---

[9]Presbyterian Healthcare concedes the quoted passage is an "interpretive statement . . . no longer formally binding on FINRA members," but contends it "remains the seminal authority of FINRA's view on this issue."  Complaint n.1, at 8.

for the Ninth Circuit, which found that "issuers are customers of their underwriter when the underwriter recommended a swap transaction."  Complaint ¶ 27, at 10 (citing Ross Sinclaire & Associates v. Premier Sr. Living, LLC, No. CIV 11-5104 YGR, 2012 WL 2501115, at *2 (N.D. Cal. June 27, 2012)).

Goldman Sachs answered Presbyterian Healthcare's Complaint in September, 2014.  See Goldman, Sachs & Co.'s Answer, Defenses and Counterclaims to Plaintiffs' Complaint for Declaratory and Injunctive Relief, filed September 30, 2014 (Doc. 26)("Answer").  Goldman Sachs asserts that the Broker-Dealer Agreement between it and Presbyterian Healthcare contains an "exclusive forum-selection clause requiring that 'all actions and proceedings arising under th[e] Broker-Dealer Agreement or any of the transactions contemplated thereby shall be brought in the United States District Court in the County of New York,' and not in this Court."  Answer ¶ 10, at 2-3 (alteration in original Answer but not in quoted source).  Goldman Sachs "admits and avers" that the Securities and Exchange Commission ("SEC") "has investigated the practices and procedures of various financial institutions, including Goldman Sachs, with respect to the ARS market . . . [,]" but that "the SEC investigation resulted in a highly publicized market-wide settlement which amplified disclosure of the very practices of which Presbyterian Healthcare now alleges it was unaware at the time."  Answer ¶ 16, at 3-4.  Goldman Sachs asserts that, consequently, "PHS's claims and theories are baseless, particularly in light of its own disclosures and information at their [sic] disposal concerning 'support bids' and the potential for failed auctions."  Answer ¶ 29, at 19.  Goldman Sachs also challenged the applicability of W. Va. Univ. Hosp., arguing that the Court of Appeals for the Second Circuit "affirmed the [district court's decision] only in part and expressly declined to affirm on the basis of the district court's determination that a municipal auction rate securities issuer was a 'customer' of the underwriter

as contemplated by FINRA Rule 12200."  Answer, ¶ 24 at 5 (citing <u>UBS Fin. Servs., Inc. v. W.</u>

<u>Virginia Univ. Hospitals, Inc.</u>, 660 F.3d 643, 650 (2d Cir. 2011)).

Goldman Sachs asserts eleven defenses: (i) Presbyterian Healthcare violated the forum-selection clause in the Broker-Dealer Agreement by filing the Complaint outside of the Southern District of New York; (ii) "PHS lacks standing to bring this action"; (iii) "[t]his Court lacks subject matter jurisdiction over this action"; (iv) "[t]his Court is an improper venue for PHS's claims"; (v) Presbyterian Healthcare is not Goldman Sachs' customer under FINRA; (vi) Presbyterian Healthcare's Complaint fails to state a claim; (vii) "PHS's claims are barred, in whole or in part, by the doctrine of unclean hands"; (viii) "PHS's claims are barred, in whole or in part, by the doctrine of laches"; (ix) "PHS's claims are barred, in whole or in part, by the doctrines of equitable estoppel, waiver and/or other equitable doctrines"; (x) "PHS's claims are barred by PHS's own breaches of contract"; and (xi) "PHS's claims are barred by the statute of limitations."  Answer at 8-9.

Goldman Sachs asserts that Presbyterian Healthcare seeks arbitration under FINRA for purely strategic purposes:

> The reason PHS filed its claims before FINRA is simple and transparent on its face: all of PHS's claims are time-barred under the applicable statutes of limitation and fly in the face of its own disclosures, and would be subject to dismissal at the outset if brought in federal court.  PHS is attempting to use the FINRA forum to circumvent, or at least forestall focus on, the applicable statutes of limitation and other facial deficiencies of their claims.

Answer ¶ 24, at 11.  Goldman Sachs notes that Presbyterian Healthcare filed its arbitration request with FINRA "almost six years after the first and only of PHS's ARS auctions failed, and long past the expiration of the four-year statutes of limitation governing its claims." Answer ¶ 26, at 18.

Goldman Sachs requests that the Court: (i) dismiss Presbyterian Healthcare's Complaint "on the merits, in its entirety and with prejudice"; (ii) declare that FINRA "is not an appropriate forum to resolve a dispute between Goldman Sachs and PHS pursuant to their contracts related to ARS," and that "FINRA has no jurisdiction to adjudicate the FINRA Arbitration"; (iii) "[p]reliminarily and permanently enjoin[] PHS from pursuing any claims against Goldman Sachs in the FINRA Arbitration"; (iv) award Goldman Sachs suit's costs; and (v) grant "such other relief as may be just and proper." Answer ¶¶ 1-5, at 22.

Goldman Sachs explains that it seeks this relief because

> arbitration is a creature of contract, and a FINRA arbitration panel has no authority to decide whether the parties have submitted to it under the terms of their contract. It is well-settled law that only a court can determine whether parties agreed to arbitrate and, under the terms of the Broker-Dealer Agreement, the Southern District of New York is the parties' exclusive required forum.

Answer ¶ 33, at 20. Goldman Sachs contends it will suffer irreparable harm if Presbyterian Healthcare is not enjoined from pursuing its FINRA claim, because

> it will (i) be deprived of its right to select the forum in which it expressly agreed to resolve disputes, (ii) be forced to arbitrate a dispute it has not agreed to arbitrate, and (iii) be forced to incur the substantial time and expense of defending itself in the arbitration proceeding, or risk an adverse outcome in those proceedings, even though Goldman Sachs is not legally compelled to arbitrate PHS's stale claims.

Answer ¶ 39, at 21-22.

On the same day it filed its Answer, Goldman Sachs submitted the Motion. In the Motion, Goldman Sachs argues:

> PHS transparently seeks to avoid litigating in the SDNY, the contractually mandated forum which, at the time of PHS's filing, had in *four separate decisions* -- two of which were recently affirmed by the U.S. Court of Appeals for the Second Circuit . . . -- enforced identical forum-selection clauses and required that similar claims regarding ARS be brought in New York federal court rather than before FINRA."

Motion at 1-2 (emphasis in original).  Additionally, Goldman Sachs contends that Presbyterian Healthcare filed its claim with FINRA two years after the statutes of limitations lapsed on Goldman Sachs' alleged acts,[11] see Motion at 5-6, with each claim "plainly depend[ing] on Goldman Sachs' role as a broker-dealer for PHS' ARS," Motion at 6.

Goldman Sachs argues that the Court should grant the Motion, because motions to transfer venue, when based on valid forum-selection clauses, should not be denied absent extraordinary circumstances, of which there are none in this case.  See Motion at 9.  Goldman Sachs notes that, in Atlantic Marine Construction Co. v. U.S. District Court for the Western District of Texas, 134 S. Ct. 568 (2013)("Atlantic Marine"), the Supreme Court of the United States held that, while § 1404(a)[12] is the proper transferring mechanism for enforcing a forum-selection clause, "[t]he presence of a valid forum-selection clause requires district courts to adjust their usual § 1404 analysis in three ways."  Motion at 8 (quoting Atlantic Marine, 134 S. Ct. at 581)(internal quotation marks omitted).

---

[11]Goldman Sachs explains:

> PHS asserts claims against Goldman Sachs in the FINRA Arbitration for (i) violation of MSRB and NASD duties, (ii) violation of the New Mexico Uniform Securities Act, (iii) negligent misrepresentation, (iv) breach of fiduciary duty, (v) fraud, (vii) unjust enrichment, and (viii) violation of the New Mexico Unfair Practices Act. . . .  PHS's common law and New Mexico statutory claims are all subject to four-year statute of limitations.  And PHS has no standing to pursue its only other claim for violations of MSRB and FINRA Rules.

Motion at 6 (internal citations omitted).

[12]Section 1404(a) of Title 28 of the United States Code provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. §  1404(a).

- 15 -

First, "the plaintiff's choice of forum merits no weight.  Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."  [Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 134 S. Ct. 568, 581 (2013)]  Second, "a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests" -- which presumptively "weigh entirely in favor of the pre-selected forum" -- and "may consider arguments about public-interest factors only." Id. at 582.  Third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice of law rules" because, inter alia, this "would . . . encourage gamesmanship" and "create or multiply opportunities for forum shopping."  Id. at 582-83.

Motion Memo. at 8-9 (quoting Atlantic Marine, 134 S. Ct. at 581-83).

Goldman Sachs asserts that there is nothing "exceptional" about this case.  Motion at 9. First, Goldman Sachs asserts, "there is no dispute that the forum-selection clause in the Broker-Dealer Agreement is valid" because: (i) "it was negotiated at arm's length between the parties, and PHS was represented by experienced legal counsel," Motion at 9-10; and (ii) "forum-selection clauses are 'prima facie valid,'" Motion at 10 (quoting Milk 'N' More v. Beavert, 963 F.2d 1342, 1346 (10th Cir. 1992)).

Second, Goldman Sachs argues that the exclusive forum-selection clause is mandatory by its use of the word "shall."  Motion at 10 (citing Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 922 F. Supp. 2d 435, 443 (S.D.N.Y. 2013)(Sullivan, J.), aff'd, 764 F.3d 210, 15 (2d Cir. 2014)(Walker, J., joined by Katzmann & Droney, JJ.)).  Third, Goldman Sachs argues that the phrase "all actions and proceedings" in the Broker-Dealer Agreement "encompasses this action (and, for that matter, the FINRA Arbitration proceeding)," because Presbyterian Healthcare's FINRA claims "are inextricably related to -- and 'arise out of' -- Goldman Sachs' alleged conduct as broker-dealer for PHS's ARS."  Motion at 10-11.  Goldman Sachs asserts that "[a]ll courts to consider materially identical forum-selection clauses in the Second Circuit have

readily concluded that claims about underwriters' and broker-dealers' conduct involving ARS (such as PHS's claims here) fall within such clauses."  Motion at 11 (citing Goldman, Sachs & Co. v. Golden Empire Schools Fin. Auth., 764 F.3d 210 (2d Cir. 2014)("Golden Empire"); and Goldman, Sachs & Co. v. N.C. Mun. Power Agency No. 1, No. CIV 13-1319 PAC, 2013 WL 6409348, at *13 (S.D.N.Y. Dec. 9, 2013)(Crotty, J.)("North Carolina Municipal Power Agency")).  Goldman Sachs asserts that the Broker-Dealer Agreement also covers the allegations regarding the interest-rate swaps, as "they too involve solely Goldman Sachs' conduct as broker-dealer for the ARS auctions."  Motion at 9.

Additionally, Goldman Sachs asserts that a "merger clause" in the Broker-Dealer Agreement "further confirms that PHS's claims arise out of that Agreement, providing that it, 'and the other agreement and instruments executed and delivered in connection with the issuance,' constitute the 'entire agreement between the parties' relating to PHS' ARS issuance."  Motion at 11 (emphases in Motion but not in quoted source)(quoting Broker-Dealer Agreement at 13).

Goldman Sachs also argues that Presbyterian Healthcare cannot point to any public-interest factors favoring a denial of the Motion.  See Motion at 13.  First, it asserts that these cases do not overburden the Southern District of New York, as "in the past two years alone the Southern District of New York heard and decided the issue posed by Presbyterian Healthcare's Complaint in four nearly identical cases, and each of them was decided within ten months or less from the date of filing."  Motion at 13.  Second, Goldman Sachs says that, because Presbyterian Healthcare's claims primarily concern financial transactions in New York, the case lacks a local interest for keeping the dispute in New Mexico.  See Motion at 13.  Third, it contends that both the Court and the Southern District of New York "are equally 'at home with

the law' governing this action [as] PHS's [c]omplaint . . . is brought pursuant to federal statute (28 U.S.C. §§ 2201 and 2202) and a Federal Rule of Civil Procedure (Rule 57)." Motion at 13.

Rather, Goldman Sachs argues that public interest factors favor honoring the forum-selection clause. See Motion at 13-14. First, it argues doing so protects the parties' bargained-for expectations. Motion at 13-14. Second, it contends that applying the clause would prevent "the very sort of gamesmanship and forum shopping that Atlantic Marine is meant to avoid." Motion at 14. Goldman Sachs argues:

> PHS's admission that 'municipal issuers similarly situated' to it were enjoined from proceeding before FINRA in the SDNY where its claims must be litigated under the parties' exclusive forum selection clause confirms that, through this action, PHS is engaged in a transparent effort to forum shop so that it could avoid immediate denial of its right to proceed before FINRA, and immediate dismissal of its claims under the governing statutes of limitation.

Motion at 14 (internal citations omitted).

Presbyterian Healthcare responded to the Motion nearly two months later. See Plaintiffs' Opposition to Defendant's Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) at 15, filed November 24, 2014 (Doc. 35)("Response"). In its Response, Presbyterian Healthcare argues that it filed its Complaint in the appropriate venue because: (i) Goldman Sachs has a duty to arbitrate with Presbyterian Healthcare under FINRA, see Response at 7; and (ii) the FINRA arbitration is pending in New Mexico, and district courts can compel arbitration only within their own districts, see Response at 14.

Presbyterian Healthcare argues that Goldman Sachs must arbitrate with Presbyterian Healthcare pursuant to a written agreement it entered into when it became a FINRA member. See Response at 8. The "written agreement" is the FINRA rules and regulations, which includes the FINRA Code of Arbitration, requiring, among other things, that FINRA members arbitrate disputes relating to its business activities upon a customer's request. See Response at 8.

Presbyterian Healthcare asserts that it is Goldman Sachs' "customer" for several reasons. Response at 9-10.  First, the FINRA Code of Arbitration "defines 'customer' broadly to exclude only one group, 'broker or dealer.'   In the light of such a broad definition courts have consistently rejected constructions that would narrow or limit the rule's scope."  Response at 9 (citing Wash. Square Sec., Inc. v. Aune, 385 F.3d 432, 436 (4th Cir. 2004); John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001)(Meskill, J., joined by Parker, J.)).

Second, Presbyterian Healthcare argues that its relationship with Goldman Sachs is consistent with the "plain meaning" of the term "customer."  Response at 10 (citing Webster's Third New International Dictionary 559 (3d ed. 2002)(defining "customer" as "one that purchases some commodity or service")).   This definition is an appropriate description, Presbyterian Healthcare asserts, because "Goldman represented to [Presbyterian Healthcare] that it was going to provide [Presbyterian Healthcare with] a variety of services and that [Presbyterian Healthcare] did, indeed, purchase those services from Goldman," and "those purchased services related directly to the issuance of securities."  Response at 10.  Presbyterian Healthcare argues:

> In the totality of the relationship, Goldman advised [Presbyterian Healthcare] on an ongoing basis as to their debt needs and structure, and for that advice, Goldman was awarded several underwriting assignments where it received large fees.  Additionally, Goldman facilitated the creation of interest-rate swaps by selling the swaps, as well as providing on-going advice, monitoring, and advisory services regarding the bonds and the swaps long after the original issuance.  In short, Goldman received compensation for providing numerous services to [Presbyterian Healthcare].  As a result, [Presbyterian Healthcare] are "customers" of Goldman within the plainest meaning of the word.

Response at 10-11.  Third, Presbyterian Healthcare argues that "[f]ederal courts around the country have universally held that an issuer of securities is the customer of its underwriter" for the purposes of arbitration under FINRA -- or its predecessor NASD.  Response at 11-12.

Presbyterian Healthcare further argues that "even if it were a close call as to whether [Presbyterian Healthcare] were customers, which it is not, the law favoring arbitration would require an interpretation of the FINFRA Arbitration Code that includes [Presbyterian Healthcare]," because of a policy presumption in favor of arbitration when the issue is ambiguous. Response at 13 (citing Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 475-76 (1989)("[D]ue regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration."); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)("[A]ny doubts concerning the scope of arbitrable issues [should] be resolved in favor of arbitration."); United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 584-85 (1960) (finding that without an "express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where . . . the arbitration clause [is] quite broad")).

Presbyterian Healthcare argues that it is "entitled, and in fact required, to bring action in this venue to enforce their arbitration rights," because the FINRA action was in New Mexico, and federal courts "have consistently held that only the district court in the location of the arbitration can compel arbitration." Response at 14.

Presbyterian Healthcare contends that the Broker-Dealer Agreement's forum-selection clause does not require that Southern District of New York try this dispute, because

> (a) the clause does not cover the underlying dispute, which is broad and includes claims that cannot possibly be construed to arise from the B-D Agreement; and further (b) as a matter of law, a forum selection clause in a separate, narrower agreement cannot supplant a broader, preexisting obligation to arbitrate.

Response at 14-15.

Presbyterian Healthcare argues that, "[i]n seeking to enjoin the FINRA Arbitration, Goldman attempts to envelope a complex advisory relationship that has spanned many years and multiple transactions under a single agreement that governs what is essentially one administrative task."  Response at 15.  Presbyterian Healthcare contends that its dispute relates to Goldman Sachs' broader role as Presbyterian Healthcare's investment advisor, and is not limited to Goldman Sachs' issuing of the ARS bonds and facilitating the interest rate swaps.  See Response at 15.  Presbyterian Healthcare describes this relationship as beginning in 2004, when Goldman Sachs "advised PHS on its capital formation strategy . . . [which] culminated in the issuance of the 2004 ARS Bonds[,] included the structuring and issuance of the debt, and included advisory services and recommendations regarding how much debt to issue."  Response at 15-16.  Presbyterian Healthcare asserts that Goldman Sachs not only facilitated the issuing of the ARS bonds and the interest rate swaps, but also advised Presbyterian Healthcare about undertaking those transactions.  See Response at 16-17.

Presbyterian Healthcare asserts that its arbitration claims relate to transactions not contemplated by the Broker-Dealer Agreement.  See Response at 21.  Presbyterian Healthcare notes that the bulk of its arbitration claims concern the interest rate swaps in 2006, which, Presbyterian Healthcare asserts, "could not have been 'contemplated' by the 2004 [Broker-Dealer] Agreement as they were not recommended until years later."  Response at 21.

Presbyterian Healthcare contends its grievances arise from Goldman Sachs' role as an advisor.  See Response at 15.  For instance, in 2006, when Presbyterian Healthcare wished to take advantage of favorable interest rates by locking in low rates on its variable rate debt,

> Goldman explored different opportunities to lock in those low rates, and
> ultimately recommended that PHS synthetically fix the ARS Bonds with an
> interest rate swap.  This recommendation was predicated on the basis that the
> proposed interest rate swaps provided "the greatest flexibility for future capital

plans."  This representation was categorically false, especially in light of the risks
of potential failures in the auction rate market and forms the largest component of
[Presbyterian Healthcare's] FINRA Arbitration.

Response at 16 (emphasis in Proposal)(quoting Proposal)(citations omitted).   Additionally,

Presbyterian Healthcare contends that, in the years leading up to the ARS market collapse,

Goldman Sachs "failed to disclose to [Presbyterian Healthcare] the dire situation in the ARS

market or that it was considering exiting the ARS market altogether."  Response at 17.

Presbyterian Healthcare asserts that the Broker-Dealer Agreement is "merely an ancillary

agreement to Goldman underwriting and advising on the 2004 ARS Bonds and has nothing to do

with this case."   Response at 20.   Presbyterian Healthcare notes that it also entered a

broker-dealer agreement with Citigroup Global Markets, Inc., and argues:

> Were [Presbyterian Healthcare] asserting claims "arising out of" the
> [Broker-Dealer] Agreement, [it] would have also named Citi, the other broker-
> dealer for the ARS Bonds.  Instead, [Presbyterian Healthcare] [has] not alleged
> wrongdoing on the part of Citi, because Citi did not have a longstanding and
> trusted advisory relationship with PHS, as Goldman did.  Moreover, unlike
> Goldman, Citi did not continue to advise [Presbyterian Healthcare] on the state of
> the ARS market or subsequent additional financial transactions related to the 2004
> ARS Bonds.

Response at 20.   Presbyterian Healthcare also describes the Broker-Dealer Agreement with

Goldman Sachs as a

> primarily administrative agreement[] . . . [that] merely defines the roles and duties
> of the broker-dealers and the auction agent in the forthcoming auctions [and]
> outlines the auction procedures, along with laying out additional notice
> provisions.  It is not, as [Goldman Sachs] appears to assert, the controlling
> document for everything related to an ARS bond issuance.

Response at 17.

Presbyterian Healthcare notes that it and Goldman Sachs entered into many other

agreements relating to the 2004 ARS bonds, and only the Broker-Dealer Agreement stipulates

that New York law shall apply.  See Response at 18.  The rest, with one exception,[13] "are governed by New Mexico law and either call for New Mexico as the required forum or are silent."  Response at 18.  As such, Presbyterian Healthcare contends that reading the Broker-Dealer Agreement broadly, as Goldman Sachs suggests, creates "an irreconcilable conflict of law . . . between the governing documents."  Response at 18-19.  For example, Presbyterian Healthcare notes that "the Auction Agreement tracks most of the language of the [Broker-Dealer] Agreement, but requires that 'proceedings arising out of this Auction Agreement' be 'brought in the United States District Court in Minneapolis, Minnesota . . . .'"  Response at 19.

Additionally, Presbyterian Healthcare notes that the NMHELC was not a party to the Broker-Dealer Agreement and, thus, the Court cannot compel the NMHELC to litigate in New York.  See Response at 21-22.  The only agreement between Goldman Sachs and the NMHELC is the Underwriter Agreement, which, Presbyterian Healthcare asserts, "does not include a forum selection clause, but specifically states that it is governed by New Mexico law."  Response at 21.  As such, "[t]here is no way to interpret the two agreements together such that the forum selection clause in the Broker-Dealer Agreement can be read to apply to any and all disputes arising under any and all other agreements Goldman has with other parties."  Response at 21-22.

Finally, Presbyterian Healthcare argues that "a forum selection clause in a separate, narrow agreement does not supplant a broad, preexisting obligation among parties to arbitrate."  Response at 21-22.  Presbyterian Healthcare cites a case from the United States Court of Appeals for the Fifth Circuit which found that, "'in the absence of a contrary expression of intent,' [a]

---

[13]Presbyterian Healthcare asserts that the Auction Agreement "calls for Minnesota law and venue to apply."  Response at 18.

stock purchase agreement was at least 'susceptible to an interstation' favoring arbitration."
Response at 22 (quoting Personal Sec. & Safety Sys. Inc. v. Motorola Inc., 297 F.3d 388, 394-95
(5th Cir. 2002)(Jolly, J., joined by Barksdale & Jones, JJ.)).  Presbyterian Healthcare also notes
that the Fourth Circuit, faced with similar facts and contract language as in this case, rejected
"the underwriters' argument that the broker dealer agreements superseded, displaced, or waived
the requirement for FINRA arbitration," finding instead that the broker-dealer agreement "[did]
not supersede an existing obligation to arbitrate."   Response at 23 (citing Carilion, 706 F.4d at
330).   Presbyterian Healthcare notes "[t]hat decision was subsequently followed in a similar
case" in UBS Securities LLC, v. Alliana Health System, No. CIV 12-2090 MJD/JJG, 2013 WL
500373 (D. Minn. Feb. 11, 2013), but concedes that "there is currently a split among the Circuits
as to whether the forum selection clause in such broker-dealer agreements can supersede or
waive the right to FINRA arbitration."  Response at 23.

Goldman Sachs replied a month later.  See Reply Memorandum of Law in Further
Support of Goldman, Sachs & Co.'s Motion to Transfer Pursuant to 28 U.S.C. § 1404(a), filed
December 22, 2014 (Doc. 36)("Reply").   Goldman Sachs argues that whether FINRA Rule
12200 is a written agreement to arbitrate with customers is irrelevant, because

> the question here is whether the [forum-selection clause], along with the broad
> [merger clause] providing that the Broker-Dealer Agreement "and the other
> agreements and instruments executed and delivered in connection the issuance"
> constitute the "entire agreement between the parties" relating to PHS' ARS
> issuance, require this court action -- not PHS' FINRA claims -- to be litigated in
> the SDNY.  The plain language of the Broker-Dealer Agreement clearly requires
> court actions such as this be heard in the SDNY and, fatally for its Opposition,
> PHS never contends otherwise.

Reply at 3 (emphases in original).   Goldman Sachs notes that "numerous courts -- most
importantly the Second Circuit -- have considered identical forum selection clauses and identical
FINRA arbitration claims and held that the forum selection clauses supersede FINRA Rule

12200 and require all claims to be litigated in federal court." Reply at 3. As such, "PHS' desire to avoid a transfer to SDNY . . . does not constitute an 'extraordinary circumstance' under Atlantic Marine. To the contrary, Atlantic Marine is intended to prevent the precise type of gamesmanship in which PHS is engaged." Reply at 4 (emphasis in original).

Goldman Sachs disputes Presbyterian Healthcare's reading of Carilion, arguing that the Fourth Circuit "*assumed* that the ARS issuer's claims were within the scope of the forum selection clause . . . , but determined that the term 'all actions and proceedings' did not encompass arbitration." Reply at 4 (emphasis in original)(citing Carilion, 706 F.3d at 329-30). Additionally, Goldman Sachs argues that, rather than finding that "all actions and proceedings" did not cover court actions such as the one before the Court, Carilion "interpret[s] an identical forum selection clause to 'require that any litigation arising out of the agreement would have to be brought in the United States District Court in New York City.'" Reply at 4-5 (emphasis in Carilion)(quoting Carilion, 706 F.3d at 330). Furthermore, Goldman Sachs asserts that "[m]ost subsequent courts . . . address[ing] the issue have declined to follow Carilion Clinic" on whether "all actions and proceedings" include arbitration. Reply at 4.

Goldman Sachs also argues that Presbyterian Healthcare did not need to file its Complaint in the United States District Court for the District of New Mexico to compel Goldman Sachs to arbitrate, because Goldman Sachs "has never refused" to do so. Reply at 5-6. Rather, Goldman Sachs notes both it and Presbyterian Healthcare "agreed to stay the FINRA Arbitration 'pending the outcome of Goldman Sachs' challenge to FINRA's jurisdiction.'" Reply at 5 (quoting Letter from Goldman Sachs to FINRA at 1). Goldman Sachs argued that, even if Presbyterian Healthcare needed to compel Goldman Sachs to arbitrate, Presbyterian Healthcare is not required to do so in the District of New Mexico, because "courts in the Second Circuit

consider at the outset whether arbitration is required even if the arbitration would occur in another jurisdiction, and require an order to compel from another court."  Reply at 6.

Goldman Sachs argues that the Broker-Dealer Agreement applies to Presbyterian Healthcare's FINRA arbitration claims, because "all of PHS' allegations of wrongdoing . . . depend on Goldman Sachs' role in the issuance and broker-dealering of PHS' ARS."  Reply at 7 (emphases omitted).  Goldman Sachs asserts that courts have "repeatedly rejected" similar attempts by municipal debt issuers to "reframe identical allegations to prevent them from being governed by identical forum selection clauses."  Reply at 7-8 (citing Golden Empire, 764 F.3d at 216; Goldman, Sachs & Co. v. City of Reno, 747 F.3d 733, 747 (9th Cir. 2014)(Bybee, J., joined by Schroeder, J.)("Reno")).  Goldman Sachs asserts:

> Here, PHS' claims rely on substantially identical language as in Reno and Golden Empire: "[h]ad Claimants known that the success of their debt issuances was dependent on Goldman's support bids . . . Claimants would not have issued the 2004 ARS Bonds and/or would have refinanced their 2004 ARS Bonds on favorable terms or taken other mitigating action rather than enter the 2006 Swaps."  The Reno court also observed that "the core of Reno's claims is that, when negotiating with Reno to become both underwriter and broker-dealer . . . [Goldman Sachs] did not disclose its general practice of placing support bids to prevent ARS auctions from failing."  Reno, 747 F.3d at 747.  In the same vein, PHS contends that "Wall Street firms, led by [Goldman Sachs], artificially supported the market to make it appear functioning when it was not . . . by plac[ing] support bids."  As both the Second and Ninth Circuits understood, claims of the type PHS is bringing -- no matter how craftily restyled -- are claims concerning Goldman Sachs' activity as broker-dealer and are, therefore, clearly covered by the Forum Selection Clause.

Reply at 8.

Goldman Sachs also argues that Presbyterian Healthcare's "effort to portray its claims as being principally related to certain interest rate swap agreements . . . (not the 2004 ARS issuance and subsequent auctions) is unavailing," because "all of [Presbyterian Healthcare's] purported theories of liability, including as they relate to the swaps, [rests] on Goldman Sachs' failure to

- 26 -

disclose its support bidding practice *as broker-dealer* and the injuries PHS allegedly suffered as a result." Reply at 8-9 (emphasis in original). Additionally, Goldman Sachs contends that any claims relating to the interest-rate swaps are "actionable in FINRA *solely* to the extent that Goldman Sachs allegedly injured PHS in relation to PHS' ARS issuance," as "PHS is not alleging any injury [arising] directly out of the swap agreements." Reply at 9 (emphasis in original). Goldman Sachs contends that

> the alleged misconduct is that Goldman Sachs purportedly misled PHS about the true market risk at the time that PHS entered the swap agreements. PHS' own pleadings confirm this fact given that it claims that it was "Goldman Sachs' conduct in the ARS market and its lack of disclosure about the true state of the ARS market [which] served to hide the true and increasing risk of the 2004 ARS Bonds, and subsequently the Swaps, from [Presbyterian Healthcare]."

Reply at 9 (quoting Complaint ¶ 16, at 6)(second alteration in original).

Goldman Sachs argues that it is irrelevant whether it provided a long-term advisory role for Presbyterian Healthcare, because Presbyterian Healthcare "is not suing about any transaction other than the 2004 ARS issuance and Goldman Sachs' conduct in subsequent years under the Broker-Dealer Agreement." Reply at 10. Goldman Sachs contends that Presbyterian Healthcare cannot plausibly argue that Goldman Sachs "entered into an advisory relationship with PHS separate from its role as underwriter and broker-dealer for the PHS' ARS," because Presbyterian Healthcare's evidence is weak, comprising "only . . . a cover letter to a request for proposal for underwriting services sent to PHS . . . before its ARS even were issued." Reply at 10.

> The very documents PHS excerpted purporting to show this supposed "advisory relationship" include an express disclaimer that Goldman Sachs "is acting in the capacity of an *arm's-length contractual counterparty* to the user in connection with any transaction [Goldman Sachs] may enter into with the user and not as a financial advisor or a fiduciary."

Reply at 10 (emphases in original)(quoting January 2006 Discussion Materials Disclaimer at 3, dated January 23, 2006, filed December 22, 2015 (Doc. 36-4)).[15]

Goldman Sachs also argues that, just because Presbyterian Healthcare chose not to seek arbitration with Citigroup Global Markets -- with whom Presbyterian Healthcare also entered into a broker-dealer agreement -- does not indicate that Goldman Sachs provided advisory services beyond the Broker-Dealer Agreement, and, as such, a decision regarding Citigroup Global Markets "has no bearing on the question of whether PHS' claims arise from the Broker-Dealer Agreement it entered into with Goldman Sachs."  Reply at 10.

Equally irrelevant, in Goldman Sachs' view, is the fact that it and Presbyterian Healthcare entered into many other agreements beyond the Broker-Dealer Agreement, because "Goldman Sachs' obligations as they relate to auctions for PHS' ARS -- precisely what PHS challenges in the FINRA Arbitration and here -- is the subject of the Broker-Dealer Agreement and the 'transactions contemplated [th]ereby.'"  Reply at 10-11 (quoting Broker-Dealer Agreement at 14)(second alteration in original).  To support this argument, Goldman Sachs notes that (i) the Broker-Dealer Agreement "encompasses 'all actions and proceedings arising out of this [Broker-Dealer Agreement] *or any of the transactions contemplated [t]hereby*,'" Reply at 11 (emphasis in Reply but not in Broker-Dealer Agreement)(quoting Broker-Dealer Agreement at 14); and (ii) the Broker-Dealer Agreement's merger clause plainly states that it "includes not only the Broker-Dealer Agreement but also the Underwriter Agreement and all other agreements executed and delivered in connection with ARS issuance," Reply at 11-12 (citing Reno, 747 F.3d at 747; Citigroup Global Mkts., Inc. v. All Children's, 5 F. Supp. 3d 537, 539-40 (S.D.N.Y.

---

[15]In citing to January 2006 Discussion Materials Disclaimer, the Court will use the document's internal pagination, which appear on the bottom of the page, rather than the pagination that the CM/ECF system places on the upper right-hand corner of the page.

2014)(Rakoff, J.); Goldman, Sachs & Co. v. Golden Empire, 922 F. Supp. 2d at 443; North

Carolina Municipal Power Agency, 2013 WL 6409348, at *5).

Goldman Sachs also disputes Presbyterian Healthcare's argument that the Broker-Dealer

Agreement's forum-selection clause does not bind NMHELC because the NMHELC did not sign

the agreement.  See Reply at 11.  Goldman Sachs contends:

> [I]t is black letter law that a non-signatory to a contract is bound by a forum
> selection clause in that contract where the party is 'closely related to the dispute'
> such that it is 'foreseeable that it will be bound'. . . .  Here, as the issuer of the
> Bonds referenced clearly on the first page of the Broker-Dealer Agreement,
> NMHELC could readily foresee that it was bound by the Broker-Dealer
> Agreement that expressly references and clearly contemplates the issuance.

Reply at 11 (internal citations omitted)(quoting Mozingo v. Trend Pers. Servs., No. CIV 10-4149

JTM, 2011 WL 3794263, at *6 (D. Kan. Aug. 25, 2011)).

Goldman Sachs also asserts that "[t]he compromised credibility of PHS' argument is

starkly illustrated" by Presbyterian Healthcare's reference to an auction agreement stipulating

Minnesota as its exclusive forum selection, because neither Goldman Sachs nor Presbyterian

Healthcare is a signatory to the agreement.  Reply at 12.  Finally, Goldman Sachs argues that

"[i]t is of no moment that some of [the] documents may have separate choice of law clauses

because it is not 'conflicting' to have different governing laws for different aspects of a

transactions."  Reply at 12.

The Court held a hearing on March 5, 2015.  At the hearing, Goldman Sachs asserted that

Presbyterian Healthcare's arbitration complaint "is one of dozens and dozens of

arbitrations . . . filed across the country . . . by issuers of auction rate securities against banks like

Goldman Sachs,  who acted as underwriters and the broker-dealers."  Tr. at 5:15-22 (Schwartz).

Goldman Sachs contended: "[N]one of the[] issuers thought in February of 2008, when they

supposedly suffered their damages or anytime shortly after that, to bring claims against the

banks.  And what happened was, several years later, plaintiffs' counsel went around the country

marketing these claims."  Tr. at 8:16-24 (Schwartz).  Goldman Sachs asserted that Presbyterian

Healthcare filed its claim for FINRA arbitration, because FINRA offered more limitation-period

flexibility, while a four-year statute of limitations would have barred its claims in federal court.

See Tr. at 9:1-16 (Schwartz).  Goldman Sachs asserted that Presbyterian Healthcare filed its

Complaint before Goldman Sachs knew Presbyterian Healthcare had filed a request with FINRA

for arbitration.   See Tr. at 12:5-10 (Schwartz).  Goldman Sachs speculated that, given the

unhelpful precedent in the Second Circuit, Presbyterian Healthcare is "hoping that they could get

a different result either from this Court or from the Tenth Circuit than from the Southern District

of New York."  Tr. at 12:13-20 (Schwartz).

 Presbyterian Healthcare argued that Goldman Sachs is engaging in gamesmanship,

asserting that, when bank clients were filing similar FINRA complaints in previous years, these

banks "were losing on a fairly consistent basis [until] someone went and looked at the

agreements and . . . said, wait, . . . [w]e've got a new argument," which is that the forum-

selection clauses in broker-dealer agreements apply to the entire business relationship.  Tr. at

33:8-20 (Edwards).  Presbyterian Healthcare argued that there is no "reading of this particular

forum-selection clause [to indicate that it] reaches to something that happened two years later

that was not contemplated at the time.  In fact, [fixing the interest rates] was the direct opposite

of what they were thinking at the time."  Tr. at 46:9-14.

 Presbyterian Healthcare argued further that the Broker-Dealer Agreement's

"forum-selection clause and the merger clause are completely separate, [and] hav[e] nothing to

really do with one another."  Tr. at 29:22-24 (Edwards).  Presbyterian Healthcare argued that the

two clauses have different scopes: the merger clause extends to "the subject matter hereof," Tr.

at 31:13-23 (Edwards)(quoting Broker-Dealer Agreement at 13), whereas the forum-selection clause covers "all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby," Tr. at 29:25-30-11 (Edwards)(quoting Broker-Dealer Agreement at 14).

Presbyterian Healthcare argued that a "traditional merger clause" typically functions to establish that the document represents "the final agreement, and anything else . . . agreed to prior to this is merged into this [agreement]," Tr. at 34:11-15 (Edwards), and the purpose of a merger clause is "for a parol evidence issue," Tr. at 63:3-4 (Edwards). Presbyterian Healthcare asserted that "[t]his merger clause does not, in any way, shape, or form say the forum-selection clause . . . also applies to the whole rest of our relationship." Tr. at 34:25-35:3 (Edwards). Presbyterian Healthcare also argues that similar merger clauses have "been . . . misappli[ed]" by courts who "heard 'a merger clause' and said, oh, well, all these agreements . . . [are] merged into this one." Tr. at 47:7-12 (Edwards).

Goldman Sachs countered, however, that the merger clause's language -- stipulating that it  covered "instruments executed and delivered" -- indicates that it covered more than just any potential oral agreements that may have existed, and "obviously . . . [included] other written agreements that deal with the 2004 issuance." Tr. at 70:5-14 (Schwartz). Goldman Sachs further argued that, if the forum-selection clause relates only to "transactions that occur under the Broker-Dealer Agreement," then the phrase "transactions contemplated hereby" would be unnecessary. Tr. at 71:3-16 (Schwartz). Therefore, Goldman Sachs argued that the phrase "transactions contemplated hereby" would have "to have meaning separate from the Broker-Dealer Agreement." Tr. at 72:19-21 (Schwartz).

Presbyterian Healthcare also asserted that:

> The majority of our complaint . . . , and virtually all of our damages, [deal] with the 2006 swap transactions.  If there were no 2006 swap transaction, assume everything else was the same, what would have happened is they would have bought the bonds back, as they did.  They would have reissued them as debt, and almost unquestionably, this suit wouldn't exist, because the damages wouldn't have been nearly as large.

Tr. at 59:9-17 (Edwards).  Goldman Sachs disputed this assertion, arguing that Presbyterian Healthcare only now is trying to frame the issue around the 2006 interest rate swaps, when it made no such distinction in its FINRA arbitration complaint.  See Tr. at 72:25-73:20 (Schwartz). Rather, Goldman Sachs contended that Presbyterian Healthcare asserted in its FINRA claim "that Goldman Sachs defrauded [Presbyterian Healthcare] in 2004 by not telling them about the fact that the auction rate securities market might not be robust if it weren't for broker-dealer cover bids."  Tr. at 73:5-9 (Schwartz).  Goldman Sachs argued that Presbyterian Healthcare is trying to "offer the Court a way to sort of split this up and say, okay, the claims about the Broker-Dealer Agreement and the underwriter agreement have to be done in the Southern District of New York, but the claims about the swaps can go forward in arbitration."  Tr. at 73:21-74:1 (Schwartz).

The Court asked Presbyterian Healthcare, if it were to litigate only on the small portion of damages sustained from the 2004 transactions, whether the Broker-Dealer Agreement's forum selection and merger clause would cover such an action.  See Tr. at 60:7-12 (Court). Specifically, the Court asked Presbyterian Healthcare whether the forum-selection clause's phrase "transactions contemplated hereby" would apply to any of the ARS bonds that the Broker-Dealer Agreement specifically mentioned.  Tr. at 64:19-24 (Court).  Presbyterian Healthcare replied that they would not be included, see Tr. at 64:25 (Edwards), because the phrase "contemplated transactions" refers only to the auction procedures outlined in the Broker-Dealer Agreement, see Tr. at 65:15-21 (Edwards).  Presbyterian Healthcare further

argued that "[a]ny other interpretation of it means it applies to every transaction ever between the parties, and that's not what this is intended to do."  Tr. at 65-25-66: 3 (Edwards).

Presbyterian Healthcare also asserted that "whether Goldman Sachs was the broker dealer or not is irrelevant.   They were a market participant who was advising [Presbyterian Healthcare]."  Tr. at 43:24-44:2 (Edwards).  Moreover, Presbyterian Healthcare asserts that the Broker-Dealer Agreement, at its core, is "really an agreement between the auction agent and the broker-dealer.   It's really not even an agreement between [Presbyterian Healthcare], which signed on it.   [Presbyterian Healthcare] has no obligations under this agreement."   Tr. at 30:12-18 (Edwards).

Additionally, Presbyterian Healthcare contended that

there is not one shred of evidence in front of this Court that suggests that the [NMHELC] even know this Broker-Dealer Agreement existed.  They are not a signatory to it, and you're asking a New Mexico political body to take its claims where it never agreed, all the way across country to New York to basically Goldman Sachs's home court.

Tr. at 56:8-14 (Edwards).  Goldman Sachs countered that Presbyterian Healthcare offered no case law to support this argument, and further asserted that, in any case, the bond purchase agreement "specifically talks about the fact that there's going to have to be a broker-dealer agreement," which means "the NMHELC knew there was going to be a broker-dealer agreement."  Tr. at 75:14-21 (Schwartz).

## LAW REGARDING VENUE

"Venue is defined as the appropriate district court in which to file an action."  Whiting v. Hogan, 855 F. Supp. 2d 1266, 1282 (D.N.M. 2012)(Browning, J.)(citing NLRB v. Line, 50 F.3d 311, 314 (5th Cir. 1995)).   The purpose of venue is to assure that lawsuits are filed in appropriately convenient courts for the matters raised and for the parties involved in the action.

See Leroy v. Great W. United Corp., 443 U.S. 173, 185 (1979).  Venue should not be confused

with subject-matter jurisdiction, see Wachovia Bank v. Schmidt, 546 U.S. 303, 315-16 (2006), or

with personal jurisdiction, see Leroy v. Great W. United Corp., 443 U.S. 173, 185 (1979)("The

question of personal jurisdiction, which goes to the court's power to exercise control over the

parties, is typically decided in advance of venue, which is primarily a matter of choosing a

convenient forum.").  "To the extent that they are relevant, the laws relating to venue give added

protection to defendants beyond those that are provided by the statutory and constitutional

prerequisites of personal jurisdiction." 14D C. Wright, A. Miller & E. Cooper, Federal Practice

and Procedure § 3801, at 15 (3d Ed. 2007).

The default federal venue provision allows a plaintiff to file in either: (i) his or her state's

district court, so long as all defendants are also residents of the state; or (ii) in the district "in

which a substantial part of the events or omissions giving rise to the claim occurred, or a

substantial part of property that is the subject of the action is situated."

28 U.S.C. § 1391(b)(1-2).  If an action cannot be brought in either of those scenarios, a plaintiff

may bring his or her action in "any judicial district in which any defendant is subject to the

court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b)(3).

## LAW REGARDING TRANSFER OF VENUE

"Congress enacted the federal change-of-venue statute, codified at 28 U.S.C. § 1404, to

allow a district court to transfer an action filed in a proper, though not necessarily convenient,

venue to a more convenient district."  Whiting v. Hogan, 855 F. Supp. 2d 1266, 1284 (D.N.M.

2012)(Browning, J.).  Section 1404(a) vests "discretion in the district court to adjudicate motions

to transfer according to individualized, case-by-case consideration of convenience and fairness."

Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)(quoting Van Dusen v. Barrack, 376 U.S. 612, 622, (1964)).

"The statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d 973, 977 (7th Cir. 2010). The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29.

> Among the factors [a district court] should consider is the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d at 1516 (internal quotation marks omitted). See Silver v. Brown, 678 F. Supp. 2d 1187, 1204 (D.N.M. 2009)(stating the factors that the courts consider in making a venue determination under § 1404(a)), aff'd in part and rev'd in part and remanded, 382 F. App'x 723 (10th Cir. 2010).

Section 1406 "permits transfer to cure a venue defect." Whiting v. Hogan, 855 F. Supp. 2d at 1266. It provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406. Although both § 1404(a) and § 1406(a) "were broadly designed to allow transfer instead of

dismissal, § 1406(a) provides for transfer from forums in which venue is wrongly or improperly laid." Van Dusen v. Barrack, 376 U.S. 612, 634 (1964).

The "interest of justice" is a separate element of the transfer analysis that relates to the court system's efficient administration. Van Dusen v. Barrack, 376 U.S. at 626-27. "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citations omitted). In some circumstances, "[t]he interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-21 (7th Cir. 1986)). The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action. Driggers v. Clark, 422 F. App'x 747, 749-50 (10th Cir. 2011)(unpublished)(citing Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006)).

**RELEVANT NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION**

In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190. "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21 (citing Shaeffer v. Kelton, 1980-NMSC-117, ¶8, 619 P.2d 1226, 1229). "The parol evidence rule 'bars admission of

evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d 431, 437 (citation omitted). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." C.R. Anthony Co. v. Loretto Mall Partners, 1991 NMSC-070, ¶ 12, 817 P.2d 238, 242 (citation omitted). "On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible to vary or modify its terms." C.R. Anthony Co. v. Loretto Mall Partners, 1991 NMSC-070, ¶ 12 (emphasis in original)(citation omitted).

The question whether an agreement contains an ambiguity is a matter of law. See Mark V., Inc. v. Mellekas, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993) (citing Levenson v. Mobley, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987)). "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted). If, however, the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235. If, however, the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980)). New Mexico courts may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear." Mark V. Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 508–09, 817 P.2d at 242–43 ("We hold today that in determining whether a term or

expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (citation and footnote omitted)).  Once the Court finds that an ambiguity exists, the resolution of that ambiguity becomes a question of fact.  See Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.  To decide the meaning of any ambiguous terms, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent."  Mark V, Inc. v. Mellekas, 114 N.M. at 782, 845 P.2d at 1236.

## LAW REGARDING FORUM-SELECTION CLAUSES

The Court has previously stated:

> Contrary to the general rule that a defendant's removal of the action from state court waives or cures any objection to improper venue in the federal court, an objection to the lack of proper venue based on a clause designating a court of another state or a foreign court as the exclusive forum is not waived or cured if the defendant removes the action from state court.

Knight Oil Tools, Inc. v. Unit Petrol. Co., No. CIV 05-0669 JB/ACT, 2005 WL 2313715, at *2 (D.N.M. Aug. 31, 2005)(Browning, J.)(citations omitted)(citing 17 James Wm. Moore, Moore's Federal Practice §§ 111.04[3][d], 111.36[5][a], at 111-42 to 111-43, 111-179 (3d ed. 2004)).  Accord Lambert v. Kysar, 983 F.2d 1110, 1113 n.2 (1st Cir. 1993)("[A] valid forum selection clause operates to render venue improper, not only under 28 U.S.C. § 1391 [the general venue statute] but also under 28 U.S.C. § 1441(a) [the removal statute].").  See also Int'l Software Sys., Inc. v. Amplicon, Inc., 77 F.3d 112, 113-15 (5th Cir. 1996)(without discussing removal issue, affirming dismissal on improper venue grounds of action removed from state court when forum-selection clause specified state courts of another state as exclusive forum); Spradlin v. Lear Siegler Mgmt. Servs. Co., 926 F.2d 865, 866 (9th Cir. 1991)(without discussing removal issue,

affirming dismissal of removed action on improper venue grounds based on clause making Saudi Arabia exclusive forum).

"A motion to dismiss based on a forum selection clause frequently is analyzed as a motion to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3)."  K & V Sci. Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW"), 314 F.3d 494 (10th Cir. 2002) ("K & V Scientific Co., Inc. v. BMW").  The Tenth Circuit has observed that "[f]orum selection provisions are 'prima facie valid' and a party resisting enforcement carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances."  Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 957 (10th Cir. 1992)(quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10, 15 (1972)).  Only a showing of inconvenience "so serious as to foreclose a remedy, perhaps coupled with a showing of bad faith, overreaching or lack of notice would be sufficient to defeat a contractual forum selection clause."  Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958.  Even if minor inconvenience would result, that would not justify non-enforcement of the forum-selection clause.  See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 596-97 (1991).

### 1.   Choice-of-Law Issues and New Mexico Law Regarding Forum-Selection Clauses.

In Stewart Organization v. Ricoh Corp., the Supreme Court of the United States held: "Federal law, specifically 28 U.S.C. § 1404(a), governs the District Court's decision whether to give effect to the parties' forum selection clause."  487 U.S. at 32.  "The Tenth Circuit, however, has never addressed which law applies to diversity cases when interpreting forum-selection clauses in general and when addressing transfer to a federal forum in particular."  Knight Oil Tools, Inc. v. Unit Petrol. Co., 2005 WL 2313715, at *9.  Notably, the Tenth Circuit has not

drawn rigid distinctions between state and federal law when interpreting forum-selection clauses, and has applied federal law when interpreting these clauses when "there are no material discrepancies between [state] law and federal common law on these matters." Excell, Inc. v. Sterling Boiler & Mech., Inc., 106 F.3d 318, 320-21 (10th Cir. 1997)(not deciding the choice-of-law issue between Colorado law and federal law). The Court has recognized in the past that "New Mexico state courts have not had much opportunity to address forum-selection clauses." Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., No. CIV 10-1020 JB/LFG, 2010 WL 5559750, at *12 (D.N.M. Nov. 30, 2010)(Browning, J.). Relying on a case from the Tenth Circuit, the Court of Appeals of New Mexico has recognized that the general rule on enforcement of forum-selection clauses is that, "when venue is specified in a forum selection clause with mandatory or obligatory language, the clause will be enforced." Mueller v. Sample, 2004-NMCA-075, ¶ 11, 93 P.3d 769, 773 (Ct. App. 2004)(citing K & V Scientific Co., Inc. v. BMW, 314 F.3d at 499). The Court has previously found that, "although New Mexico has not addressed forum-selection clauses in particular, its decisions relating to choice-of-law provisions indicate that New Mexico would apply the same rule as the Tenth Circuit as well." Knight Oil Tools, Inc. v. Unit Petroleum Co., 2005 WL 2313715, at *9.[16]

### 2.     Enforceability of Forum-Selection Clauses.

The Supreme Court has noted that there is substantial overlap between precedent interpreting the enforceability of arbitration agreements and forum-selection clauses. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 518-19 (1974)("An agreement to arbitrate before a

---

[16]The Supreme Court of Texas has also relied on federal precedent to determine whether forum-selection clauses are enforceable. See In re AIU Ins. Co., 148 S.W.3d 109, 118-19 (Tex. 2004)(relying on federal precedent in a discussion on the enforceability of forum-selection clauses).

specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."). The Supreme Court has stated that "an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." Scherk v. Alberto-Culver Co., 417 U.S. at 518-19 (emphasis added). Reiterating this rule, the Tenth Circuit has stated: "A plaintiff seeking to avoid a choice provision on a fraud theory must, within the confines of Fed. R. Civ. P. 9(b) and 11, plead fraud going to the specific provision; the teachings of Scherk, interpreting M/S Bremen, require no less." Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960. Thus, the Tenth Circuit requires that a party seeking to avoid a forum-selection clause produce evidence showing that the arbitration provision was a product of fraud or coercion. See Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960 ("Third, at no time did Riley offer any evidence on the stipulated issues tending to show that the arbitration provision (or any other choice provision, for that matter) was a product of fraud or coercion." (emphasis in original)). The Honorable Lourdes A. Martinez, United States Magistrate Judge for the District of New Mexico, has similarly stated that "[a] general claim of fraud or misrepresentation concerning an entire contract does not affect the validity of a forum selection clause." Mann v. Auto. Protection Corp., 777 F. Supp. 2d 1234, 1240 (D.N.M. 2011) (Martinez, J.).

The Supreme Court has rejected the notion that the parties must specifically negotiate a forum-selection clause for it to be enforceable. See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. at 593 ("[W]e do not adopt the Court of Appeals' determination that a nonnegotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining."). Accord Marinechance Shipping, Ltd. v. Sebastian, 143 F.3d 216, 221

(5th Cir. 1998)(holding that a forum-selection clause in a seaman's employment contract was enforceable even when the parties did not negotiate for the provision).  Judge Martinez has similarly held:

> This argument also fails because unequal bargaining position and form contracts do not invalidate forum selection provisions.  The fact that Plaintiff is an individual and the contract was presented to him as a form contract does not invalidate the forum selection provision, and Plaintiff's belief that he could not negotiate or change the terms of the Agreement does not rise to the level of overreaching that would make it unreasonable or unfair to enforce the forum selection provision.

Mann v. Auto. Protection Corp., 777 F. Supp. 2d at 1240 (citations omitted)(citing Carnival Cruise Lines, Inc. v. Shute, 499 U.S. at 593-94).

Courts have also imposed a high standard for negating a forum-selection clause on the basis that it is inconvenient.  The Tenth Circuit has, for instance, stated:

> Finally, in Carnival Cruise Lines, the Court relied on M/S Bremen in enforcing a domestic forum selection clause, despite inconvenience to the plaintiffs.  Only a showing of inconvenience so serious as to foreclose a remedy, perhaps coupled with a showing of bad faith, overreaching or lack of notice, would be sufficient to defeat a contractual forum selection clause.

> Riley suggests that enforcement of the choice of forum and law provisions is unreasonable because he effectively will be deprived of his day in court.  The basis underlying this contention is his perception that recovery will be more difficult under English law than under American law.  Riley will not be deprived of his day in court.  He may, though, have to structure his case differently than if proceeding in federal district court.  The fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair.  English law does not preclude Riley from pursuing an action for fraud and we agree with the Defendants that the Lloyd's Act does not grant statutory immunity for such claims.  We have been shown nothing to suggest than an English court would not be fair, and in fact, our courts have long recognized that the courts of England are fair and neutral forums.  Given the international nature of the insurance underwriting transaction, the parties' forum selection and choice of law provisions contained in the agreements should be given effect.

Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958 (citations omitted).   Judge

Martinez has similarly held that, "[t]o invalidate a forum selection provision for reasons of

inconvenience, however, a party must show that enforcement of the provision would cause an

inconvenience 'so serious as to foreclose a remedy.'"   Mann v. Auto. Protection Corp., 777

F. Supp. 2d at 1240 (quoting Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958).

### 3.        Permissive and Mandatory Forum-Selection Clauses.

"The difference between a mandatory and permissive forum selection clause is that

'[m]andatory forum selection clauses contain clear language showing that jurisdiction is

appropriate only in the designated forum.'"   Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc.,

428 F.3d 921, 926 (10th Cir. 2005).   "In contrast, permissive forum selection clauses authorize

jurisdiction in a designated forum, but do not prohibit litigation elsewhere."   Am. Soda, LLP v.

U.S. Filter Wastewater Grp., Inc., 428 F.3d at 926-27 (citation omitted).   In K & V Scientific Co.

v. BMW, the Tenth Circuit adopted the majority rule for enforcing forum-selection clauses.   See

314 F.3d at 500.   Specifically, it concluded that, when venue is specified, such as when the

parties designate a particular county or tribunal, and mandatory or obligatory language

accompanies the designation, a forum-selection clause will be enforced as mandatory.   See K &

V Scientific Co. v. BMW, 314 F.3d at 499.

In Milk 'N' More, Inc. v. Beavert, the Tenth Circuit held that the forum-selection clause

was mandatory and precluded removal of the case to federal court.   See 963 F.2d at 1343.   In that

case, the defendant appealed an order remanding the breach-of-contract action to a Kansas state

court.   See 963 F.2d at 1343.   The federal district court concluded that an enforceable

forum-selection clause in the agreement required the remand.   See 963 F.2d at 1343.   The clause

in the Milk 'N' More, Inc. v. Beavert agreement provided:   "The parties herein have mutually

agreed that said lease and the purchase option agreement contained herein, where applicable, shall be governed by the laws of the State of Kansas and the parties further agree that venue shall be proper under this agreement in Johnson County, Kansas."  963 F.2d at 1343.  The federal district court granted the motion to remand on the ground that the contractual agreement contained an enforceable forum-selection clause, relying on the principle that forum-selection clauses are "prima facie valid and should be enforced" unless shown to be unreasonable.  963 F.2d at 1344 (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. at 10).  On appeal, the defendant contended that the federal district judge erred in construing the clause as a mandatory agreement between the parties to resolve any dispute under the contract exclusively in the state court in Johnson County, Kansas; he said instead that the court should have construed the clause as merely a permissive designation on venue.  See Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1344.  The defendant contended that the district court erroneously construed the contract language as an agreement making Johnson County, Kansas, the exclusive forum in which the parties could resolve disputes that arose under the agreement.  See 963 F.2d at 1345.  The Tenth Circuit affirmed, stating that the dispositive portion of the clause provided that "venue shall be proper under this agreement in Johnson County, Kansas."  963 F.2d at 1345-46.  The Tenth Circuit held: "We are persuaded that the district judge made the proper interpretation and correctly enforced the clause."  963 F.2d at 1346.

In Milk 'N' More, Inc. v. Beavert, the Tenth Circuit stated that it was mindful that a waiver of one's statutory right to be in federal court must be "clear and unequivocal."  963 F.2d at 1346 (quoting Regis Assocs. v. Rank Hotels (Mgmt.) Ltd., 894 F.2d 193, 195 (6th Cir. 1990)).  The Tenth Circuit acknowledged that, if there is ambiguity in the clause, the court should construe it against the drafter.  See Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346.

- 44 -

Nevertheless, the Tenth Circuit said that "[s]uch clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." 963 F.2d at 1346. The Tenth Circuit stated that the provision that "venue shall be proper under this agreement in Johnson County, Kansas" was "reasonably clear and the wording strongly points to the state court of that county." 963 F.2d at 1346. The Tenth Circuit said the use of the word "shall" generally indicates a mandatory intent unless a convincing argument to the contrary is made. 963 F.2d at 1346. In Milk 'N' More, Inc. v. Beavert, the Tenth Circuit cited with approval Intermountain Systems, Inc. v. Edsall Construction Co., 575 F. Supp. 1195, 1198 (D. Colo. 1983), stating that the case was particularly persuasive because it held that a similar clause: "It is agreed for purposes of this agreement, venue shall be in Adams County, Colorado." 963 F.2d at 1346. In K & V Scientific Co. v. BMW, the parties entered into a new agreement which, unlike their earlier agreement, contained a jurisdictional and choice-of-law provision, which stated: "Jurisdiction for all and any disputes arising out of or in connection with this agreement is Munich. All and any disputes arising out of or in connection with this agreement are subject to the laws of the Federal Republic of Germany." 314 F.3d at 496. The plaintiff filed suit, asserting various contract, tort, and statutory causes of action. See 314 F.3d at 497. The defendant removed the case to federal court, and moved to dismiss under to rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure for lack of personal jurisdiction and improper venue. The district court granted the defendant's motion to dismiss for improper venue. The district judge concluded that the forum-selection clause contained in the second confidentiality agreement was "unambiguous and enforceable," and demonstrated "[t]he parties' intent to locate jurisdiction for this action solely in the courts of Munich." 314 F.3d at 497. On appeal, the plaintiff argued that the clause's language contained no reference to venue, contained

no language designating the courts in Munich as exclusive, and contained no language indicating that suit elsewhere is impermissible.   See 314 F.3d at 497.   The Tenth Circuit made the distinction between a venue provision which fixed venue in a certain location -- a mandatory clause -- versus one which merely granted jurisdiction to a certain place -- a permissive clause. The Tenth Circuit set forth an analysis for determining whether forum-selection clauses within a contract are mandatory or permissive:

> This court and others have "frequently classified" forum selection clauses "as either mandatory or permissive."   Excell[, Inc. v. Sterling Boiler & Mech., Inc.], 106 F.3d   [318,] 321 [(10th Cir.1997)].   "Mandatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum."   Id. (internal quotations omitted).   "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere."   Id. (internal quotations omitted).

K & V Scientific Co. v. BMW, 314 F.3d at 498.   The Tenth Circuit cited Milk 'N' More, Inc. v. Beavert, stating that the Tenth Circuit there had concluded that a forum-selection clause stating "venue shall be proper under this agreement in Johnson County, Kansas" was mandatory.   K & V Scientific Co. v. BMW, 314 F.3d at 498.   The Tenth Circuit found, however, that no Tenth Circuit case had yet dealt with a forum-selection clause similar to the one at issue.

The Tenth Circuit stated that, "generally speaking," the Courts of Appeals are in "agreement" that the following formula is to be used in determining whether the selection clause is mandatory or permissive: "[W]here venue is specified [in a forum selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive."   K & V Scientific Co. v. BMW, 314 F.3d at 499 (alterations in original)(quoting Paper Express, Ltd. v. Pfankuch Maschinen GmbH, 972 F.2d 753, 757 (7th Cir. 1992)).   The Tenth Circuit analyzed language

from six forum-selection clauses considered permissive, including four different forum-selection clauses wherein the provision used the word "shall" together with the name of a court.  <u>K & V Scientific Co. v. BMW</u>, 314 F.3d at 499.  The <u>K & V Scientific Co. v. BMW</u> formula for the four clauses using the word "shall" and considered permissive were:

> * "Any dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts."  <u>John Boutari [& Son, Wines & Spirits, S.A. v. Attiki Imp. & Distribs. Inc.</u>], 22 F.3d [51,] 52 [(2d Cir. 1994)].
>
> . . . .
>
> * "The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract."  <u>Hunt Wesson Foods, Inc. v. Supreme Oil Co.</u>, 817 F.2d 75, 76 (9th Cir. 1987).
>
> . . . .
>
> * "This agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York."  <u>Keaty [v. Freeport Indon., Inc.</u>], 503 F.2d [955,] 956 [(5th Cir. 1974)] (concluding phrase was ambiguous and, when construed against drafter, was permissive).
>
> * "This agreement shall be governed by and construed in accordance with the laws of the Federal Republic of Germany. * * *  Place of jurisdiction shall be Dresden."  <u>Hull 753 Corp. v. Elbe Flugzeugwerke GmbH</u>, 58 F. Supp. 2d 925, 926 (N.D. Ill. 1999).

<u>K & V Scientific Co. v. BMW</u>, 314 F.3d at 499.  The other two examples of permissive clauses were:

> * "The laws and courts of Zurich are applicable."  <u>Caldas & Sons, Inc. v. Willingham</u>, 17 F.3d 123, 127 (5th Cir. 1994).
>
> . . . .
>
> * "Place of jurisdiction is Sao Paulo/Brazil."  <u>Citro Florida[, Inc. v. Citrovale, S.A.</u>], 760 F.2d 1231, 1231 (11th Cir. 1985)(concluding phrase was ambiguous and, when construed against drafter, was permissive).

K & V Scientific Co. v. BMW, 314 F.3d at 499.  The Tenth Circuit in K & V Scientific Co. v.

BMW also noted that the courts had held the following clauses to be mandatory:

> * "[P]lace of jurisdiction . . . is the registered office of the trustee [in Germany], to
> the extent permissible under the law."  Frietsch v. Refco, Inc., 56 F.3d 825, 827
> (7th Cir. 1995); see id. at 829 (concluding that the phrase "to the extent
> permissible under the law" "would have no function if the [forum selection]
> clause were not mandatory -- if, in other words, a party could sue anywhere he
> wanted").
>
> * "In all disputes arising out of the contractual relationship, the action shall be
> filed in the court which has jurisdiction for the principal place of business of the
> supplier . . . .  The supplier also has the right to commence an action against the
> purchaser at the purchaser's principal place of business."  Paper Express[, Ltd. v.
> Pfankuch Maschinen GmbH], 972 F.2d at 755; id. at 756 (concluding the last
> sentence "would be appropriate and meaningful only if the clause were in fact
> mandatory").
>
> * "Licensee hereby agrees and consents to the jurisdiction of the courts of the
> State of Virginia.  Venue of any action brought hereunder shall be deemed to be
> in Gloucester County, Virginia."   Docksider[, Ltd. v. Sea Tech., Ltd.,] 875 F.2d
> [762,] 763 (9th Cir.1989).

K & V Scientific Co. v. BMW, 314 F.3d at 499-500 (footnote omitted).

Using the majority rule, the Tenth Circuit had little trouble concluding that the

forum-selection clause at issue in K & V Scientific Co. v. BMW was permissive.  See 314

F.3d at 500.  The clause referred only to jurisdiction and did so in non-exclusive terms.  See 314

F.3d at 500.  A clause is mandatory, in accordance with K & V Scientific Co. v. BMW, only

when the venue is specific with mandatory language.  See 314 F.3d at 500.  Mandatory language

is venue coupled with such terms as "exclusive," "sole," or "only."  314 F.3d at 500.  If the

paragraph is ambiguous -- capable of being construed as either permissive or mandatory -- the

paragraph is deemed to be permissive.  The Tenth Circuit in K & V Scientific Co. v. BMW

stated:

> Even if the clause were deemed to be ambiguous (i.e., capable of being construed
> as either permissive or mandatory), the rule in this circuit and others is that the

clause must be construed against the drafter, in this case defendant.  See Milk 'N' More, 963 F.2d at 1346 (holding "if there is any ambiguity in the clause [the court] should construe it against the drafter").  Accordingly, the clause would be deemed permissive.

344 F.3d at 500-01 (citations omitted).

In an unpublished decision that followed K & V Scientific Co. v. BMW, the Tenth

Circuit clarified that K & V Scientific Co. v. BMW decision addresses the issue

> whether a recognition-of-jurisdiction provision implies an exclusive selection of venue.  Use of mandatory language like "shall" in a clause dealing directly with venue carries stronger implications regarding the intent to designate an exclusive forum.  See Milk 'N' More, 963 F.2d at 1346 (holding clause stating that "venue shall be proper . . . in" effected an exclusive designation of forum).  When, as here, the relation of such language to the question of venue is at most derivative, through a jurisdictional provision, decisions such as "Milk 'N' More . . . are of little assistance in resolving the . . . dispute."   K & V Scientific, 314 F.3d at 498-99.

King v. PA Consulting Grp., Inc., 78 F. App'x 645, 648 n.2 (10th Cir. 2003)(unpublished)

(emphasis in original).  The Tenth Circuit, in American Soda, LLP v. U.S. Filter Wastewater

Group, Inc., has also recognized that a party to a contract can waive venue in federal court in a

forum-selection clause, thus requiring remand the dispute to state court:

> The parties not only consented to the jurisdiction of the Colorado state courts, they went a step further by designating the state courts or arbitration as "the exclusive forum for the resolution of any disputes related to or arising out of [the contract]."   We conclude that by consenting to state court jurisdiction and selecting the state courts as the "exclusive forum," the parties indicated their intent to make venue exclusive in state court with respect to any disputes not resolved in arbitration.  Because the forum selection clause at issue is mandatory, U.S. Filter unequivocally waived its right to remove this lawsuit to federal court.

428 F.3d at 927.

### 4.      Coverage of Tort Claims Under a Forum-Selection Clause.

Judge Martinez has stated: "Even though the Tenth Circuit has not addressed this issue,

the United States Supreme Court has applied a forum selection provision in a case involving tort

claims." <u>Mann v. Auto Protection Grp.</u>, 777 F. Supp. 2d at 1243 (citing <u>Carnival Cruise Lines, Inc. v. Shute</u>, 499 U.S. at 588).  The Court has followed the same approach in <u>Knight Oil Tools, Inc. v. Unit Petroleum Co.</u>, looking also at whether "the forum-choice provision involved . . . is broad enough to include tort actions."  2005 WL 2313715, at *13 ("That the tort and breach of contract claim involve the same operative facts also counsels that the forum-selection clause apply to the tort claim.").  In a case where there was a contract between a passenger and a cruise line the passenger asserted tort causes of action against the cruise line, the Supreme Court enforced a forum-selection clause against the passenger.  <u>See</u> <u>Carnival Cruise Lines, Inc. v. Shute</u>, 499 U.S. at 588-90 ("We granted certiorari to address the question whether the Court of Appeals was correct in holding that the District Court should hear respondents' tort claim . . . .  Because we find the forum-selection clause to be dispositive of this question, we need not consider petitioner's constitutional argument as to personal jurisdiction.").  "In addition, other Courts of Appeal have held that where tort claims 'ultimately depend on the existence of a contractual relationship' between the parties, such claims are covered by a contractually-based forum selection clause, despite the 'pleading of alternative non-contractual theories of liability.'" <u>Mann v. Auto Protection Grp.</u>, 777 F. Supp. 2d at 1243 (quoting <u>Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.</u>, 709 F.2d 190, 203 (3d Cir. 1983), <u>overruled on other grounds by</u> <u>Lauro Lines, s.r.l. v. Chasser</u>, 490 U.S. 495 (1989))(citing <u>Lambert v. Kysar</u>, 983 F.2d at 1121-22).

## <u>LAW REGARDING NEW MEXICO CHOICE-OF-LAW RULES</u>

Where a plaintiff invokes a federal district court's diversity jurisdiction, the district court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply.  <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941); <u>Pepsi-Cola Bottling Co. v. PepsiCo, Inc.</u>, 431 F.3d 1241, 1255 (10th Cir. 2005).  The first step in a New

Mexico choice-of-law analysis is to characterize the claim by "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue." Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d 374, 377.  There are only a few categories within which claims might fall -- "[t]ort cases, i.e., all 'civil wrongs,' are one class; contracts, i.e., every kind of enforceable promise, is another single class." James A. McLaughlin, Conflict of Laws: the Choice of Law Lex Loci Doctrine, the Beguiling Appeal of a Dead Tradition, Part One, 93 W. Va. L. Rev. 957, 989 (1991)(describing the categories as "tort, contract, or some other").  The court is then to apply the New Mexico choice-of-law rule applicable to that category of claim to determine what state's substantive law to apply.  See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 749 F. Supp. 2d 1235, 1257 (D.N.M. 2010)(Browning, J.).

When a claim sounds in contract, New Mexico will generally apply the choice-of-law rule of *lex loci contractus* -- the law of the place of contracting.  See Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 52, 188 P.3d 1156, 1172.  Like most states, however, "New Mexico respects party autonomy; the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision." Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d 1215, 1218 (citing N.M. Stat. Ann § 55-1-301(A)).  See United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶ 11, 775 P.2d 233, 236.  "[W]hen application of the law chosen by the parties offends New Mexico public policy," however, a New Mexico court "may decline to enforce the choice-of-law provision and apply New Mexico law instead." Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7.  "New Mexico courts will not give effect to another state's laws where those laws would violate some fundamental principle of justice." Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7 (internal quotation

marks omitted).  Where the plaintiff has invoked the federal district court's diversity jurisdiction, the court will accept New Mexico's law regarding whether to honor a contractual choice-of-law provision.  See MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006)("In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause.").

If on the other hand, the underlying claim is categorized as a tort, "New Mexico courts follow the doctrine of *lex loci delicti commissi* -- that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred."  Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 12.  Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.  See First Nat'l Bank in Albuquerque v. Benson, 1976-NMCA-072, ¶ 9, 553 P.2d 1288, 1289 (referring to the rule as requiring application of "the law of the State of injury"); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 663 F. Supp. 2d 1138, 1150-51 (D.N.M. 2009)(Browning, J.).

Claims for unjust enrichment are distinct from claims sounding in contract or tort law. See Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 19, 793 P.2d 855, 860 ("We have no disagreement with the scholarly view that restitution for unjust enrichment constitutes an independent basis for recovery in a civil-law action, analytically and historically distinct from the other two principal grounds for such liability, contract and tort.").  The Restatement (First) of Conflict of Laws § 453 provides: "When a person is alleged to have been unjustly enriched, the law of the place of enrichment determines whether he is under a duty to repay the amount by which he has been enriched."  Restatement (First) of Conflict of Laws § 453.  Although "New Mexico has traditionally followed the Restatement (First)," Ferrell v. Allstate Ins. Co., 2008-

NMSC-042, ¶ 50, the Supreme Court of New Mexico has been willing to follow the Restatement

(Second) of Conflict of Laws in certain cases, such as in multi-state class action cases in which

the laws of the states involved actually conflict, because the Restatement (First) of Conflict of

Laws is "particularly ill-suited for the complexities present in multi-state class actions," Ferrell

v. Allstate Ins. Co., 2008-NMSC-042, ¶ 56 (adopting the Restatement (Second) of Conflict of

Laws for multi-state contract class actions).   In Fowler Brothers, Inc. v. Bounds, the Court of

Appeals of New Mexico explained that courts can "avoid a choice of law question when the laws

of the involved states would produce identical results," 2008-NMCA-091, ¶ 9, and agreed with

the district court's implicit determination that Arizona and New Mexico law on unjust

enrichment did not conflict as applied in the case, see 2008-NMCA-091, ¶ 20.

## LAW REGARDING ARBITRATION AGREEMENTS AND THE FEDERAL ARBITRATION ACT

The Federal Arbitration Act, 9 U.S.C. §§ 1 through 16 ("FAA"), governs the enforcement

of arbitration clauses in commerce and maritime contracts.   Section 2 of Title 9 of the United

States Code provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.   "The FAA thereby places arbitration agreements on an equal footing with other

contracts, and requires courts to enforce them according to their terms."   Rent-A-Center, W., Inc.

v. Jackson, 130 S. Ct. 2772, 2776 (2010)(citing Buckeye Check Cashing, Inc. v. Cardegna, 546

U.S. 440, 443 (2006); Volt Info. Sci., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489

U.S. 468, 478 (1989)).   "Like other contracts, however, they may be invalidated by 'generally

applicable contract defenses, such as fraud, duress, or unconscionability.'" Rent-A-Center, W., Inc. v. Jackson, 130 S. Ct. at 2776 (citing Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)).  The states have limited ability, however, to find arbitration clauses unconscionable.  In AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740 (2011), the Supreme Court ruled that courts may not find arbitration clauses precluding class-wide arbitration unconscionable because such restrictions interfere with the FAA's "overarching purpose . . . to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings."  131 S. Ct. at 1748.  In Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395 (1967), the Supreme Court held that, once a court determines that a claim is subject to arbitration, the court is without authority to address the claim's merits.  See 388 U.S. at 400 ("Section 3 requires a federal court in which suit has been brought 'upon any issue referable to arbitration under an agreement in writing for such arbitration' to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement.").  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate."  Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995).

Under § 4 of the FAA, a party "aggrieved" by another party's failure "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  If a party is aggrieved by another's refusal to arbitrate under a written agreement, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  Section 2, the "primary substantive provision of the Act," Moses H. Cone Mem'l

Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." Rent-A-Center, W., Inc. v. Jackson, 130 S. Ct. at 2774.

> 1.      **Strong Federal Policy Favoring Arbitration**.

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994). See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984) ("Congress declared a national policy favoring arbitration."); Hill v. Ricoh Ams. Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'")(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24). Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision. See Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. at 474 (stating that Congress designed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts"). When the applicability of arbitration is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25).

2.    **Agreements to Arbitrate Arbitrability.**

"[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777.  The Supreme Court has explained that this rule "merely reflects the principle that arbitration is a matter of contract."  Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777.  The Supreme Court has described the term arbitrability as "whether the parties agreed to arbitrate [a] dispute."  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 942 (1995)(Breyer, J.).  Accord AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)(describing arbitrability as "whether" an "agreement creates a duty for the parties to arbitrate the particular grievance").  The Supreme Court clarified that "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate."  Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. at 70-71.  In other words, "regardless of whether a contract as a whole is valid, agreements to arbitrate are severable from a larger contract, and may therefore be separately enforced and their validity separately determined."  Quilloin v. Tenet HealthSystem Philadelphia, Inc., 673 F.3d 221, 229 (3d Cir. 2012).  As the Supreme Court has discussed:

> The Agreement here contains multiple "written provision[s]" to "settle by arbitration a controversy."  Two are relevant to our discussion.  First, the section titled "Claims Covered By The Agreement" provides for arbitration of all "past, present or future" disputes arising out of Jackson's employment with Rent-A-Center.  Second, the section titled "Arbitration Procedures" provides that "[t]he Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable."  The current "controversy" between the parties is whether the Agreement is unconscionable.  It is the second provision, which delegates resolution of that controversy to the arbitrator, that Rent-A-Center seeks to enforce.  Adopting the terminology used by the parties, we will refer to it as the delegation provision.

> The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement. We have recognized that parties can agree to arbitrate "gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. This line of cases merely reflects the principle that arbitration is a matter of contract. An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other. The additional agreement is valid under § 2 "save upon such grounds as exist at law or in equity for the revocation of any contract," and federal courts can enforce the agreement by staying federal litigation under § 3 and compelling arbitration under § 4. The question before us, then, is whether the delegation provision is valid under § 2.

Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777-78.

A district court must resolve the question of arbitrability before submitting a dispute to arbitration. See Oil, Chem. & Atomic Workers Int'l Union (AFL-CIO) v. Conoco, Inc., 241 F.3d 1299, 1305 (10th Cir. 2001)("The possibility that the district court might revisit the arbitrability question at the conclusion of the arbitration proceedings is not an adequate substitute for a pre-arbitration ruling."); Parrish v. Valero Retail Holdings, Inc., 727 F. Supp. 2d 1266, 1273 (D.N.M. 2010)(Browning, J.)("In the Tenth Circuit, and in the courts of New Mexico, the 'existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked.'" (quoting Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997))).

The Supreme Court has held that "courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." Rent-A-Center, W., Inc. v. Jackson, 130 S.Ct. at 2777 (alterations in original). In other words:

> In this manner the law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement" -- for in respect to this latter question the law reverses the presumption.

First Options of Chi., Inc. v. Kaplan, 514 U.S. at 944 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. at 626).  The Tenth Circuit has stated that, "[o]f course, the most 'clear and unmistakable' agreement to arbitrate the issue of arbitrability would be an express statement to that effect in the parties' contractual agreement to arbitrate disputes arising between them."  Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 968 (10th Cir. 2001), rev'd on other grounds 537 U.S. 79 (2002).  The Tenth Circuit has held that the phrase in an "arbitration clause" that referred to the arbitrator handling "any and all disputes arising out of or relating to the contract" was not clear and unmistakable, because "there is no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent to submit to an arbitrator the question whether an agreement to arbitrate exists."  Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 780 (10th Cir. 1998).

The United States Court of Appeals for the Eighth Circuit found the following language to be clear and unmistakable regarding arbitrability: "Any controversy concerning whether an issue is arbitrable shall be determined by the arbitrator(s)."  Sadler v. Green Tree Servicing, LLC, 466 F.3d 623, 624 (8th Cir. 2006).  The Ninth Circuit found the following language to be clear and unmistakable regarding arbitrability:

> If a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement or the validity or application of any of the provisions of this Section 4, and, if the dispute cannot be settled through negotiation, the dispute shall be resolved exclusively by binding arbitration.

Momot v. Mastro, 652 F.3d 982, 988 (9th Cir. 2011)(emphasis in original).

The Second Circuit clarified that the First Options standard requiring clear and unmistakable evidence of the parties' intentions applies only to determining whether the parties agreed to arbitrate arbitrability, not to all questions relating to arbitrability.  Abram Landau Real

- 58 -

Estate v. Bevona, 123 F.3d 69, 73 (2d Cir. 1997)(McLaughlin, J., joined by Meskill & Lasker, JJ.). In that case, the Second Circuit was interpreting a provision that stated that "[a] Contract Arbitrator shall have the power to decide all differences arising between the parties to this agreement as to interpretation, application or performance of any part of this agreement." 123 F.3d at 73. The Fourth Circuit has held that "an arbitration clause committ[ing] all interpretive disputes relating to or arising out of the agreement does not satisfy the clear and unmistakable test." Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 102 (4th Cir. 2012)(alteration in original). The United States Court of Appeals for the Seventh Circuit concluded that the following language was not clear and unmistakable: a provision requiring arbitration of "all differences arising out of the interpretation or application of any provision of [the] agreement." Local 744, Int'l Bhd. of Teamsters v. Hinckley & Schmitt, Inc., 76 F.3d 162, 163-65 (7th Cir. 1996)(alteration in original). In an unpublished opinion, the United States Court of Appeals for the Sixth Circuit concluded that the following language was not clear and unmistakable: "[T]he arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code which interpretation shall be final and binding upon the parties." Sec. Serv. Network, Inc. v. Cromwell, 62 F.3d 1418, 1995 WL 456374, at *3 (6th Cir. 1995)(unpublished table decision).

## ANALYSIS

The Court will grant the Motion and transfer this case to the Southern District of New York, because Presbyterian Healthcare's claims all arise out of the Broker-Dealer Agreement, in which the parties agreed that all actions and proceedings must be brought in the United States District Court in the County of New York. The Broker-Dealer Agreement's forum-selection

clause is mandatory.  Furthermore, the Court concludes that there is no reason that it should not be enforced.

I.      **THE  BROKER-DEALER  AGREEMENT'S  FORUM-SELECTION  CLAUSE APPLIES TO ALL OF PRESBYTERIAN HEALTHCARE'S CLAIMS.**

The Court concludes that all of Presbyterian Healthcare's claims, including those relating to the 2006 interest rate swaps, arise out of the Broker-Dealer Agreement -- and not an advisory relationship -- because they all concern the issuing of the ARS Bonds.

A.      **GOLDMAN SACHS' ALLEGED MISREPRESENTATIONS OF THE ARS BOND  MARKET  ARISE  OUT  OF  THE  BROKER-DEALER AGREEMENT.**

The Court interprets "arising out of" a contract to mean originating from, and bearing causal connection with, the contract.  The Court, the Tenth Circuit, nor the Federal Circuit has offered a precise definition of the phrase "arising out of."  Many courts have noted that "arising out of" is more narrow than other terms, like "relating to" or "connected to," etc.  See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 644 (1985); Phillips v. Audio Active Ltd., 494 F.3d 378, 389 (2d Cir. 2007)("Phillips"); John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1074 (3d Cir. 1997).  The most thorough consideration of the matter comes from the Second Circuit, with which the Court agrees.  In Phillips, the Second Circuit noted that some courts have declined to differentiate between phrases like "arising out of", "in connection with," "relating to," etc., see, e.g., Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1361 (2d Cir. 1993), and others have found that a claim "arises out of" an agreement if construction of that agreement resolves the dispute, see, e.g., Omron Healthcare, Inc. v. Maclaren Exports Ltd., 28 F.3d 600, 603 (7th Cir. 1994).  The Phillips court instead adopted a "language-specific" approach, finding "no reason to presume the parties meant anything other than the dictionary definition of the term," Phillips, 494 F.3d at 390.  The court adopted the

"arise out of" definition set forth in <u>Coregis Insurance Company v. American Health Foundation,</u> <u>Inc.</u>, 241 F.3d 123, 128 (2d Cir. 2001)(Sotomayor, J., joined by Walker, C.J., & Pooler, J.):

> To "arise" out of means "to originate from a specified source."  Webster's Third New International Dictionary 117 (1986); <u>see also</u> Black's Law Dictionary 102 (7th ed. 1999)(defining "arise" as "1.  To originate; to stem (from) . . . 2.  To result (from)").  The phrase "arising out of" is usually interpreted as "indicat[ing] a causal connection." <u>American States Ins. Co. v. Guillermin</u>, 108 Ohio App. 3d 547, 560, 671 N.E.2d 317, 325 (Ohio Ct. App. 1996);

<u>Coregis Ins. Co. v. Am. Health Found., Inc.</u>, 241 F.3d at 128.

Several courts facing an identical forum-selection clause and almost identical claims, as in this case, have found that the claims "arise out of" the broker-dealer contract.  Presbyterian Healthcare is not the first ARS bond issuer to sue Goldman Sachs over its alleged manipulation of the ARS Bond market.  In <u>Goldman, Sachs and Co. v. Golden Empire Schools Financing</u> <u>Authority</u>, a "public financing authority" in California retained Goldman Sachs to issue ninety-five million dollars of ARS bonds. 922 F. Supp. 2d at 437.  The parties signed multiple underwriter agreements and broker-dealer agreements.  <u>See</u> 922 F. Supp. 2d at 437.  As in this case, the broker-dealer agreement contained a forum-selection clause stipulating that "all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York."  922 F. Supp. 2d at 438.  After the ARS auctions failed in 2008, Golden Empire sought FINRA arbitration, arguing that, by not telling it about Goldman Sachs' "cover bids," Goldman Sachs had fraudulently induced Golden Empire into issuing ARS bonds.  922 F. Supp. 2d at 438.  Goldman Sachs responded by filing a complaint in Southern District of New York, seeking an injunction against the FINRA arbitration on the grounds that the broker-dealer agreement's forum-selection clause precluded it.  <u>See</u> 922 F. Supp. 2d at 437.  Golden Empire argued that its claims arose out of the underwiter agreements and not the broker-dealer agreements, and thus the

broker-dealer agreement's forum-selection clause did not apply.  See 922 F. Supp. 2d at 443.

The Honorable Richard J. Sullivan, United States District Judge for the Southern District of New

York ruled:

> Golden Empire's claims are inextricably linked to the Broker-Dealer Agreements and cannot escape application of the Forum Selection Clause.  Though Golden Empire argues that its breach of fiduciary duty, fraud, and negligent misrepresentation claims arise solely out of the Underwriter Agreements, even a cursory review of the Statement of Claim reveals that assertion to be false.  Golden Empire's FINRA action hinges on Goldman's placement of "cover bids" to support ARS auctions in its role as broker-dealer.  Specifically, Golden Empire recites in its Statement of Claim that its action for breach of fiduciary duty arises, in part, from "the extent to which [Goldman Sachs'] cover bid practice created and manipulated the market for ARS generally," "disguis[ing]" the lack of natural demand for ARS."  Similarly, the fraud claim states that had Golden Empire "known that the ARS market was wholly dependent on Goldman's support bids and that if broker-dealers like Goldman ceased [their] support bidding policy the market would collapse," Golden Empire would have sought an alternative vehicle for its debt.  Finally, Golden Empire's negligent misrepresentation claim declares that Goldman had a duty to disclose "the extent of its involvement in propping up the ARS market."  Thus, the Court concludes that the entirety of Golden Empire's dispute with Goldman arises from the Broker-Dealer Agreements and is subject to the Forum Selection Clauses limiting jurisdiction to the Southern District.

922 F. Supp. 2d at 443-44 (emphases added)(citations omitted).  On appeal, the Second Circuit

upheld the district court's ruling, finding that "the broadly worded forum selection clause

encompasses 'all actions and proceedings arising out of . . . any of the transactions contemplated'

by the broker-dealer agreements, which plainly include Golden Empire's . . . ARS issuances."

Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210, 216 (2d Cir. 2014)(first

alteration in original).

    Reno tells a similar story.  The City of Reno hired Goldman Sachs to issue $211 million

in ARS bonds, signing multiple underwriter and broker-dealer agreements.  See 747 F.3d

at 735-37.  The broker-dealer agreements contained an identical forum-selection clause as in

Golden Empire and in this case.  See 747 F.3d at 736-737.  After the ARS market collapsed in

2008, the City of Reno attempted to arbitrate with Goldman Sachs under FINRA, but Goldman

Sachs filed a claim in the United States District Court for the District of Nevada to enjoin the

arbitration on the grounds that the broker-dealer agreements' forum-selection clause precluded

arbitration.  See 747 F.3d at 737.  The district court denied Goldman Sachs' motion, and

Goldman Sachs appealed to the Ninth Circuit.  See 747 F.3d at 738.  The Ninth Circuit found

that the forum-selection applied:

> [A]ll of Reno's claims are inextricably linked to the 2005 and 2006 Broker-Dealer
> Agreements.  The core of Reno's claims is that, when negotiating with Reno to
> become both underwriter and broker-dealer for the 2005 and 2006 Bonds,
> Goldman did not disclose its general practice of placing support bids to prevent
> ARS auctions from failing.  Reno asserts that "[h]ad [it] known that [its ARS]
> would be wholly-dependent on Goldman's continued support bidding
> practice . . . , Reno would never have taken the risk. . . .  Instead, Reno could have
> chosen an alternative structure for the financing."  As damages, Reno seeks, inter
> alia, "disgorgement of all fees and costs associated with issuing the ARS [and]
> conducting the auctions," i.e., both underwriter and broker-dealer fees.
> Accordingly, all of Reno's claims arise, at least in part, out of the 2005 and 2006
> Broker-Dealer Agreements and are therefore subject to the forum selection
> clauses that limit jurisdiction to the District of Nevada.

Goldman, Sachs & Co. v. City of Reno, 747 F.3d at 747 (emphasis added).

In North Carolina Municipal Power Agency, the defendant worked with Goldman Sachs

to issue $149.7 million in ARS bonds.  2013 WL 6409348, at *1.  The parties signed underwriter

and broker-dealer agreements, and the broker-dealer agreement contained a forum-selection

clause identical to the one in this case.  See 2013 WL 6409348, at *1.  After the ARS bond

market crashed, and North Carolina Municipal Power Agency Number One sought arbitration

with Goldman Sachs under FINRA, Goldman Sachs filed to enjoin the arbitration under the

broker-dealer agreement's forum-selection clause.  The court ruled in Goldman Sachs' favor:

> NCMPA1's FINRA claims are also tied to the Broker-Dealer Agreement.  The
> claims focus on whether Goldman failed to disclose its use of "cover bids" to
> support the ARS auctions in its role as broker-dealer.  In particular, Goldman
> purportedly failed to disclose that it "always placed a bid in every auction in

which it was lead broker-dealer to prevent auction failure, and that Goldman was aware at all times that if it failed to place a bid for its own account in the auctions it managed, a large number . . . of the actions would fail and the market for ARS would collapse."   NCMPA1 brought its action to recover damages it sustained due to these claimed misrepresentations and omissions, which were made "during the structuring process and during the 5 years that Goldman . . . served as [a] broker-dealer[] for NCMPA1's bonds."   In fact, throughout the SOC, NCMPA1 references Goldman's role as a "broker-dealer" and describes Goldman's failure to fulfill its responsibilities as such.   ("For the next five years, Goldman served as broker-dealer for NCMPA1's ARS, earning hundreds of thousands of dollars in periodic broker-dealer fees while continuing to fail to disclose [the use of cover bids.]").   NCMPA1 cannot wish away the terms of the Broker-Dealer Agreement when its claims are based on Goldman's actions as a broker-dealer.

Goldman, Sachs & Co. v. N. Carolina Mun. Power Agency No. One, 2013 WL 6409348, at *7

(emphasis added)(alterations in original)(internal citations omitted).

Similar as they are, there are a few differences between the case before the Court and the cases in the Second and Ninth Circuits.   Here, Presbyterian Healthcare argues that its claims arise from a broader advisory relationship, while the defendants in the above cases argued that their claims arose from the underwriter agreement, which lacked a forum-selection clause.   See North Carolina Municipal Power Agency, 2013 WL 6409348, at *7; Reno, 747 F.3d at 747; Golden Empire, 922 F. Supp. 2d at 443.   Presbyterian Healthcare's business dealings with Goldman Sachs involved interest rate swaps, which, of the above cases, only Reno has in common.   See Reno, 747 F.3d at 741.   The above rulings, hailing from courts within the Second and Ninth Circuits, do not, of course, bind the court.   Yet, when a party presents new arguments for a fact pattern virtually identical to those in several other cases yielding, from that party's perspective, discouraging results, the Court must be wary that these pleadings are not merely artful.

Presbyterian Healthcare's claims are inextricably linked to, and originate from, the ARS bonds.   In their FINRA Claim and briefings to the Court, Presbyterian Healthcare asserts that

Goldman Sachs misrepresented the ARS market's stability from the moment of the ARS Bond creation in 2004, see Complaint ¶¶ 15-16, at 5-6, to the ARS bond market crash in 2008. In its FINRA Claim, Presbyterian Healthcare requests awards that include refinancing the ARS bonds, fees incurred by the ARS Bonds' issuance, and costs of the bonds over the synthetic rate they expected from the 2006 interest rate swaps. See FINRA Claim at 29.

Even the 2006 interest rate swaps are inextricably linked to, and originate from, the ARS Bonds. The swaps were designed to complement the ARS Bonds and to bring in the same amount of interest income as Presbyterian Healthcare would owe on the ARS Bonds. As Presbyterian Healthcare described the swaps:

> Under the terms of the proposed 2006 Swaps, PHS agreed to pay a Goldman affiliate a fixed rate between 3.526% and 3.579% on a total notional amount of about $135,000,000. In return, PHS would receive 68% of the monthly London Interbank Offer Rate ("LIBOR") on the same notional amount. According to Goldman, 68% of monthly LIBOR would closely approximate the rates set on the ARS Bonds, therefore the amount received under the Swaps would cover the variable amounts payable under the ARS Bonds. This would leave PHS with only its fixed rate payment under the 2006 Swaps. When all other costs of the ARS Bonds were factored in, according to Goldman, PHS was supposed to have synthetically created all-in fixed rate of about 3.9% for the remaining life of the ARS Bonds.

FINRA Claim ¶ 27, at 11 (emphases added). Presbyterian Healthcare also explains that "the effectiveness of the 2006 Swaps was heavily reliant on the willingness of Goldman to continue buying the ARS Bonds and/or ensure that rates set in the auctions were in line with rates payable under the 2006 Swaps." FINRA Claim ¶ 30, at 12. In other words, to whatever extent the 2006 Swaps cost Presbyterian Healthcare money in the end -- either for failing to provide Presbyterian Healthcare the income needed to pay the ARS bond interest or the cost of terminating the Swaps -- the damages resulted from one specific origin: Goldman Sachs' alleged misrepresentations about the ARS Bond market. The Court is comfortable finding that any interest rate swap claims

originate from, and bear a causal connection with, the issuing of the ARS Bonds.   When Goldman Sachs enticed Presbyterian Healthcare to enter interest-rate swaps rather than leave the ARS bond market, this action was not a new and distinct tort; it was simply another moment at which Goldman Sachs asserted that the ARS bond market was a safe bet.

### B.   PRESBYTERIAN HEALTHCARE'S CLAIMS DO NOT ARISE FROM AN ADVISORY RELATIONSHIP, BECAUSE PRESBYTERIAN HEALTHCARE HAS NOT DEMONSTRATED THAT GOLDMAN SACHS OWED IT A FIDUCIARY DUTY.

Presbyterian Healthcare alleges that its claims do not arise out of the Broker-Dealer Agreement, and, instead, arise out of a broader advisory relationship between Presbyterian Healthcare and Goldman Sachs.  See Response at 15-16.  Presbyterian Healthcare argues that the claims arise from a "complex advisory relationship that has spanned many years and multiple transactions."  Response at 15.  Presbyterian Healthcare describes this relationship as beginning in 2004, when Goldman Sachs "advised PHS on its capital formation strategy . . . [which] culminated in the issuance of the 2004 ARS Bonds[,] included the structuring and issuance of the debt, and included advisory services and recommendations regarding how much debt to issue."  Response at 15-16.

Presbyterian Healthcare argues that, "[i]n seeking to enjoin the FINRA Arbitration, Goldman attempts to envelope a complex advisory relationship that has spanned many years and multiple transactions under a single agreement that governs what is essentially one administrative task."  Response at 15.  Presbyterian Healthcare contends that its dispute relates to Goldman Sachs' broader role as Presbyterian Healthcare's investment advisor, and is not limited to Goldman Sachs' issuing of the ARS bonds and facilitating the interest rate swaps.  See Response at 15.  Presbyterian Healthcare describes this relationship as beginning in 2004, when Goldman Sachs "advised PHS on its capital formation strategy . . . [which] culminated in the

issuance of the 2004 ARS Bonds[,] included the structuring and issuance of the debt, and included advisory services and recommendations regarding how much debt to issue." Response at 15-16. Presbyterian Healthcare asserts that Goldman Sachs not only facilitated the issuing of the ARS bonds and the interest rate swaps, but advised Presbyterian Healthcare to undertake those transactions. See Response at 16-17. Presbyterian Healthcare argues that, "[i]n the totality of the relationship, Goldman advised [Presbyterian Healthcare] on an ongoing basis as to their debt needs and structure, and for that advice, Goldman was awarded several underwriting assignments where it received large fees." Response at 10 (emphasis added).

To the extent that Presbyterian Healthcare asserts, in its arbitration action, non-contract claims like breach of fiduciary duty, see FINRA Claim at 25, these claims fall within the forum-selection clause's reach, because courts have interpreted forum-selection clauses broadly to govern freestanding, non-contract claims. See, e.g., Abbott Labs. v. Takeda Pharm. Co., 476 F.3d 421, 424 (7th Cir. 2007)(finding that a tort action for breach of fiduciary duty falls within a forum-selection clause, because the "dispute is the parties' disagreement over the validity and interpretation of the clause"); Absolute Activist Master Value Fund, Ltd. v. Ficeto, No. CIV 09-8862 GBD, 2013 WL 1286170, at *18 (S.D.N.Y. Mar. 28, 2013)("When forum selection clauses contain 'relating to' or 'arising under' language, courts are inclined to interpret those clauses broadly to cover disputes beyond those for breach of contract," including claims for breach of fiduciary duty  (citing Coregis Ins. Co. v. Am. Health Found., 241 F.3d at 128)). Presbyterian Healthcare alleges that Goldman Sachs breached its fiduciary duty when it "advis[ed] that [Presbyterian Healthcare] enter into and maintain . . . complex, volatile and risky financing structures [and] artificially supported the ARS market and then withdrawing from that market for its own profit." FINRA Claim at 25. While breach of fiduciary duty is not a contract

claim, its subject concerns the Broker-Dealer Agreement and the issuing of the ARS bonds, and, therefore, falls within the Broker-Dealer Agreement's forum-selection clause's purview.

Moreover, as a general matter, the Court is wary of allowing a party seeking to avoid a forum-selection clause to simply assert that its claims in fact arise out of a greater implied advisory relationship, particularly where Presbyterian Healthcare can offer little more than Goldman Sachs' proposals and presentations featuring language that could be construed as offering advice. While Presbyterian Healthcare cannot point to a written agreement that clearly establishes Goldman Sachs' investment adviser role, Presbyterian Healthcare may still plausibly argue that its claims arise out of an advisory relationship if it can demonstrate that Goldman Sachs breached a fiduciary duty. As Presbyterian Healthcare cites no controlling authority nor presented any legal theories why Goldman Sachs owed Presbyterian Healthcare a fiduciary duty, the Court must do some legwork of its own.

In diversity jurisdiction cases such as this one, the Court employs New Mexico's choice-of-law rules to determine which state's substantive law to apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. at 496-97; Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d at 1255. The first step in this analysis is to determine whether the dispute is one based on tort law, contract law, or domestic relations. See Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11. Because a breach-of-fiduciary-duty claim would be a tort action, see Restatement (Second) of Torts § 874 (1979)("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act."), the Court will consider the laws "of the place where the wrong occurred," Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 12. Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred. See First Nat'l Bank in Albuquerque v. Benson, 1976-NMCA-072,

¶ 9 (referring to the rule as requiring application of "the law of the State of injury"); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 663 F. Supp. at 1150-51.  The Court finds that New Mexico law would apply in this case, because a company in New Mexico suffered the alleged harm -- financial loss.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. CIV 08-1101 JB/RLP, 2009 WL 3672505, at *6 (D.N.M. Sept. 29, 2009)(Browning, J.)("[B]ecause the harm alleged is to the financial condition of a New Mexico company, New Mexico law applies to [the plaintiff's] tort claims.")

New Mexico recognizes that "[i]nvestment advisers enter into relationships of 'trust and confidence' with their clients," State ex rel. Udall v. Colonial Penn Ins. Co., 1991-NMSC-048, ¶ 33, 812 P.2d 777, 785 (internal quotation marks omitted)(quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 190 (1963)), and that "the investment adviser is a fiduciary," State ex rel. Udall v. Colonial Penn Ins. Co., 1991-NMSC-048, ¶ 33, 812 P.2d at 785 (internal quotation marks omitted)(quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. at 194).  Yet, without a contract reflecting an advisory relationship, or any specific evidence besides Presbyterian Healthcare's conclusory assertions indicating such a relationship existed, the Court can only proceed by considering, more generally, whether Goldman Sachs' conduct created a fiduciary relationship.

In New Mexico, a fiduciary relationship "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence."  Alcantar v. Sanchez, 2011-NMCA-073, 257 P.3d 966, 975-76 (internal quotation marks omitted)(quoting Moody v. Stribling, 1999-NMCA-094, ¶ 18, 985 P.2d 1210).  Presbyterian Healthcare fails to provide sufficient evidence that it held a "special confidence" in Goldman Sachs.  Rather, the evidence

before the Court suggests otherwise.  For one, the parties negotiated their only written agreements at arms length, with experienced counsel representing each party.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 2009 WL 3672505, at *10 ("Without being shown any authority for the existence of a fiduciary duty between two commercial entities, represented by counsel, and negotiating at arms length, the Court is unwilling to conclude that, under New Mexico law, a fiduciary duty would exist.").  For another, the materials Presbyterian Healthcare submits as proof of an advisory relationship, see, e.g., Proposal, are entirely consistent with a seller promoting its goods.  What is more, one of the materials that Presbyterian Healthcare submits as proof of an advisory relationship features a "Disclaimer" page which concludes with a seemingly express -- although perhaps not conspicuous -- indication that Goldman Sachs never intended its recommendations to be reflective of an advisory relationship:

> The fact that the Goldman Sachs Group, Inc. has made the materials or any other materials available to you constitutes neither a recommendation that you enter into or maintain a particular transaction or position nor a representation that any transaction is suitable or appropriate for you.  Transactions involving derivative or other products may involve significant risk and you should not enter into any transactions unless you fully understand all such risks and have independently determined that such transaction is appropriate for you.  The Goldman Sachs Group, Inc. is acting in the capacity of an arm's-length contractual counterparty to the user in connection with any transaction the Goldman Sachs Group, Inc. may enter into with the user and not as a financial advisor or a fiduciary.

January 2006 Discussion Materials Disclaimer at 3.  See May 2005 Discussion Materials Disclaimer at 3, dated May 12, 2015, filed December 22, 2015 (Doc. 36-3)(featuring an identical paragraph as part of a similar presentation).

Even if the Court determined that New York law should apply, the outcome is the same. In New York, a fiduciary relationship "exists between two persons when one of them is under a duty to act or to give advice for the benefit of another upon matters within the scope of the relation."  EBC I Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31 (N.Y. 2005).  The

"determination of a fiduciary relationship is fact-specific, [but] no such relationship exists between those involved in arm's length business transactions." HF Mgmt. Servs. LLC v. Pistone, 818 N.Y.S.2d 40, 42 (2006)(citing Ne. Gen. Corp. v. Wellington Adv. Inc., 624 N.E.2d 129, 131 (N.Y. 1993)).  New York courts do not find that an underwriter-issuer relationship creates a fiduciary obligation absent additional factors.  See HF Mgmt. Servs. LLC v. Pistone, 818 N.Y.S.2d at 42 (2006).  Likewise, "[t]here is no general fiduciary duty inherent in an ordinary broker/customer relationship." BNP Paribas Mortgage Corp. v. Bank of Am., N.A., 866 F. Supp. 2d 257, 269-71 (S.D.N.Y. 2012)(citing Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir. 1998)).

Generally speaking, a fiduciary duty exists when "one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge." WIT Holding Corp. v. Klein, 282 A.D.2d 527, 529 (N.Y. 2001).  A party seeking to establish a fiduciary duty must show that "the relationship was 'unique or distinct' from the relationship the institution typically enjoyed with individuals." Sears v. First Pioneer Farm Credit, ACA, 46 A.D.3d 1282, 1286 (N.Y. 2007).

Presbyterian Healthcare fails to provide sufficient evidence that its relationship with Goldman Sachs was "unique or distinct" for the same reasons that Presbyterian Healthcare failed to demonstrate that it held a "special confidence" in Goldman Sachs under New Mexico law: the evidence suggests that the parties were acting in their traditional roles as broker-dealer and as issuer.  Moreover, Presbyterian Healthcare puts forth no evidence that Goldman Sachs received the underwriting contract in exchange for its advisory services -- i.e., there is nothing indicating that the Underwriting contract's terms were inconsistent with a normal underwriting transaction.

Presbyterian Healthcare also fails to demonstrate that it "repose[d] confidence" in Goldman Sachs or that it "reasonably relie[d] on its superior expertise or knowledge." While Presbyterian Healthcare undoubtedly trusted Goldman Sachs' expertise, Presbyterian Healthcare does not demonstrate that it put complete faith into Goldman Sachs to a degree that would push that confidence level from merely being a willing Goldman Sachs customer to expecting a fiduciary duty. Presbyterian Healthcare submits Goldman Sachs' proposals and presentations, but offers no evidence that it believed at any time before filing its suit that it regarded Goldman Sachs as something more than an underwriter and broker-dealer of ARS bonds. The mere fact that Goldman Sachs apparently created these ARS Bonds and interest-rate swaps to address Presbyterian Healthcare's unique needs does not indicate it assumed a fiduciary role.

Moreover, even assuming that Presbyterian Healthcare relied on Goldman Sachs, there is little indicating to the Court that such reliance would have been reasonable. While some documents could, arguably, flirt with a representation of itself as an advisor, these representations are entirely consistent with what they in fact turned out to be: not promises of good advice, but fancy words amounting to little more than a sales pitch. If a client expected unbiased financial advice, it would be reasonable to question the seemingly odd coincidence that each financial instrument which Goldman Sachs recommended happened to be designed and sold by Goldman Sachs.

## II. THE FINRA ARBITRATION CLAUSE DOES NOT PRECLUDE THE BROKER-DEALER'S FORUM SELECTION CLAUSE'S APPLICABILITY TO PRESBYTERIAN HEALTHCARE'S ACTION BEFORE THE COURT.

Presbyterian Healthcare asserts that "regardless of the applicability of the forum selection clause, a forum selection clause in a separate, a narrow agreement does not supplant a broad, preexisting obligation among the parties to arbitrate." Response at 22. Presbyterian Healthcare

provides two cases to support this proposition.  First, Presbyterian Healthcare contends that Personal Security and Safety Systems Inc. v. Motorola Inc., 297 F.3d at 394-95, holds that, "'in the absence of a contrary expression of intent,' the stock purchase agreement was at least 'susceptible to an interpretation' favoring arbitration" and that "given federal policy favoring arbitration, even aspects of a dispute that may otherwise be governed by a narrow agreement will be subject to arbitration."  Response at 22 (quoting Pers. Sec. & Safety Sys. Inc. v. Motorola Inc., 297 F.3d at 394-95).

No presumption towards arbitration exists here, however.  The presumption applies only when the parties dispute only the scope of an arbitration clause, but "disappears when the parties dispute the existence of a valid arbitration agreement."  Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir.2002)(emphasis added).  See also Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 301 (2011)(stating that "the presumption of arbitrability only [applies] where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand"); Applied Energetics, Inc. v. NewOak Capital Markets, LLC, 645 F.3d 522, 526 (2d Cir. 2011)(holding that "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made").

In Personal Security and Safety Systems, Inc. v. Motorola, Inc., the arbitration question was not whether the arbitration agreement existed or was valid, but rather what is the extent of its scope:

> Motorola and PSSI agree that the Product Development Agreement contains a valid arbitration provision and that there are no external constraints that preclude arbitration of PSSI's claims.  Thus, the central question is whether the arbitration provision covers the claims arising solely out of the Stock Purchase Agreement alleged in PSSI's amended complaint.

297 F.3d at 392 (emphasis added).

By contrast, here Goldman Sachs questions the existence of the FIRNA Arbitration clause in light of the Broker-Dealer Agreement.  Goldman Sachs asserts that its "valid and binding agreement with PHS supersedes any right that PHS may have had to arbitrate under the FINRA Code of Arbitration Procedure."  Answer ¶ 33, at 20 (emphasis added).

Next, Presbyterian Healthcare argues that the Court should follow the Fourth Circuit's ruling in Carilion, which, Presbyterian Healthcare contends, found that "identical language in a broker-dealer agreement does not supersede an existing obligation to arbitrate," Response at 23 (citing Carilion, 706 F.3d at 330), as well as the United States District Court for the District of Minnesota, which agreed with Carilion's reasoning in UBS Securities LLC, v. Alliana Health System, rather than follow the cases in the Second and Ninth Circuits, which found otherwise.  A closer reading of Carilion, however, reveals that the Court need not make that choice here, because Carilion supports transferring this case.

The plaintiffs in Carilion -- UBS Financial Services, Inc. and Citigroup Global Markets, Inc. -- helped the defendant -- Carilion Clinic -- issue over $2 million in ARS Bonds.  Carilion, 706 F.3d at 322.  Carilion Clinic entered into broker-dealer agreements with both plaintiffs, and these agreements contained the following forum-selection clause:

> The parties agree that all actions and proceedings arising out of this Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York.  To the extent permitted by law, each of the parties hereto also irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of this Agreement or the transactions contemplated hereby.

Carilion, 706 F.3d at 329.  After the ARS Bond market collapsed in 2008, Carilion Clinic filed a FINRA arbitration claim alleging that the plaintiffs misled Carilion Clinic regarding the reliability of the ARS Bond market, and failed to disclose that they routinely placed support bids

to prevent auction failures.  See Carilion, 706 F.3d at 322.  UBS Financial and Citigroup Global

filed a complaint in the United States District Court for the Eastern District of Virginia seeking

an injunction on the arbitration proceedings and a declaratory judgment of FINRA's lack of

jurisdiction over the arbitration.  See 706 F.3d at 323.  UBS Financial and Citigroup Global

argued that the broker-dealer agreements' forum-selection clauses precluded FINRA arbitration

because the phrase "all actions and proceedings" includes arbitration; and because FINRA

arbitration cannot be brought in a district court, the forum-selection clause must supersede the

FINRA arbitration provision.  See 706 F.3d at 329.  The court rejected this argument for three

reasons.  First, the court found that assuming "actions and proceedings" includes arbitration, the

forum-selection clause "could not be read to preclude arbitration; to the contrary, it presumes its

availability but localizes it, albeit to a forum where it could not be pursued."  706 F.3d at 329

(emphasis in original).  Second, the court asserts that "one would reasonably expect that a clause

designed to supersede, displace, or waive arbitration would mention arbitration."  706 F.3d at

329.  Third -- and most important for the Court's purposes -- the Fourth Circuit concluded that if

one reads "actions and proceedings" as including arbitration,

> then the remaining portion of the paragraph becomes nonsensical.  Under this
> construction, an arbitration proceeding would be "brought in the United States
> District Court" and as to any such action or proceeding, "all right to trial by jury"
> would be waived.  The more reasonable construction would take the references to
> "court" and "jury trials" as limiting what is meant by "actions and proceedings."
> Thus, read in the context of courts and jury trials, the term "actions and
> proceedings" would be understood as a term of art, as used, for example, in
> Federal Rule of Civil Procedure 1 (providing in part, "These rules govern the
> procedure in all civil actions and proceedings in the United States district
> courts").  Similarly, the New York Civil Practice Law and Rules primarily use
> "action" and "proceeding" to refer to judicial disputes, not to arbitration.  See Int'l
> Union of Operating Eng'rs, Local No. 463 v. City of Niagara Falls, 191 Misc.2d
> 375, 743 N.Y.S.2d 236, 238 (N.Y. Sup. Ct. 2002)("An arbitration is not
> considered an action or a proceeding"), aff'd sub nom. Bathurst v. City of Niagara
> Falls, 298 A.D.2d 1010, 748 N.Y.S.2d 126 (N.Y. App. Div. 2002).  The approach
> of construing "actions and proceedings" when used in the context of courts and

jury trials to refer to judicial actions is the approach generally followed by other courts. See, e.g., Pers. Sec. & Safety Sys. Inc. v. Motorola Inc., 297 F.3d 388, 395-96 (5th Cir. 2002) (interpreting agreement requiring "any suit or proceeding" to be subject to the exclusive jurisdiction of the Texas courts not to include arbitration).

We find it a more natural reading of the forum selection clause to require that any litigation arising out of the agreement would have to be brought in the United States District Court in New York County and that as to any such action or proceeding, a jury trial would be waived.  And we believe that it would never cross a reader's mind that the clause provides that the right to FINRA arbitration was being superseded or waived.  No word even suggesting supersedence, waiver, or preclusion exists in the sentence.

Carilion, 706 F.3d at 329-30 (emphases added).

While Carilion certainly held that the forum-selection clause did not supersede the FINRA arbitration provision, it did not find that the entire forum-selection clause was invalid in light of it.  This distinction makes considerable difference in this case, because, under Carilion, the forum-selection clause's power to compel litigation to be brought in a certain forum survives its finding that the clause does not supersede arbitration actions.  Thus, applying Carilion to this case is a straightforward exercise, and achieves a result contrary to Presbyterian Healthcare's assertions: Presbyterian Healthcare has brought before the Court an "action or proceeding" and, pursuant to the forum-selection clause in the Broker-Dealer Agreement, Presbyterian Healthcare must bring such action or proceeding in the United States District Court in the County of New York.

## III.   THE FORUM-SELECTION CLAUSE IS MANDATORY, AND NO PUBLIC INTEREST FACTORS SUPPORT NOT HONORING IT.

There is nothing "exceptional" about this case to rebut the presumption that a forum-selection clause is valid.  The Tenth Circuit presumes that forum-selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances."  Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346.

Goldman Sachs asserts that there is nothing "exceptional" about this case, because "it was negotiated at arm's length between the parties, and PHS was represented by experienced legal counsel."  Motion at 9-10.  Presbyterian Healthcare appears to concede this point, offering no arguments why enforcement would be unreasonable in this case.  The Court can think of no reasons on its own and therefore agrees with Goldman Sachs that the forum-selection clause is valid.

Public interest factors favor honoring the forum-selection clause.  Goldman Sachs argues that: (i) these cases do not overburden the Southern District of New York -- asserting that "in the past two years alone the SDNY heard and decided the issue posed by Presbyterian Healthcare's Complaint in four nearly identical cases, and each of them was decided within ten months or less from the date of filing"; (ii) there is no local interest in keeping the dispute in New Mexico, given that Presbyterian Healthcare's claims primarily concern financial transactions in New York; and (iii) both the Court and the Southern District of New York "are equally 'at home with the law' governing this action [as] PHS's [c]omplaint . . . is brought pursuant to federal statute (28 U.S.C. §§ 2201 and 2202) and A Federal Rule of Civil Procedure (Rule 57)."  Motion at 13. Again, Presbyterian Healthcare declines to rebut Goldman Sachs' claims.  The Court sees no reason to disagree with Goldman Sachs on these contentions, other than to note that the Court certainly has an interest in ensuring a company within its district is afforded all due justice -- though the Court sees no compelling reason why SDNY could not provide that opportunity, even if Presbyterian Healthcare appears to face long odds there.

Goldman Sachs argues that public interest factors favor honoring the forum-selection clause, because doing so protects the parties' bargained-for expectations and dissuades "gamesmanship and forum shopping."  Motion at 13-14.  Presbyterian Healthcare denies that it

chose the District of New Mexico for cynical reasons, arguing that it was "entitled, and in fact required, to bring action in this venue to enforce their arbitration rights," because the FINRA action was in New Mexico, and federal courts "have consistently held that only the district court in the location of the arbitration can compel arbitration."  Response at 14 (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer, 49 F.3d 323, 327 (7th Cir. 1995), Mgmt. Recruiters Int'l, Inc. v. Bloor, 129 F.3d 851, 853 (6th Cir. 1997), Inland Bulk Transfer Co. v. Cummins Engine Co., 332 F.3d 1007, 1018 (6th Cir. 2003)).  It does not follow, however, that this district would be the only court capable of hearing the question of whether a party must arbitrate.  Section 3 of Title 9 of the United States Code provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  A Southern District of New York court summarized the statute:

> In other words, the court acts to enable referral in accordance with the terms of the arbitration agreement's forum selection provision, albeit potentially by a court in another jurisdiction that is authorized to enforce the agreement, if a particular forum is designated, or by the court where the action is pending if no arbitration venue is specified by the parties.

DaPuzzo v. Globalvest Mgmt. Co., L.P., 263 F. Supp. 2d 714, 739 (S.D.N.Y. 2003)(Marrero, J.). While the Court declines to ponder whether Presbyterian Healthcare' choice of venue reflects "gamesmanship and forum shopping," Motion at 14, it concludes that when, as in this case, a forum-selection clause designates a forum other than the one that can lawfully compel arbitration, that bargained-for forum remains the appropriate venue for a party seeking to compel arbitration, if only to earn the right to bring the suit elsewhere.

The forum-selection clause is mandatory, because its language cannot be reasonably construed as being permissive.  Goldman Sachs argues that the exclusive forum-selection clause is mandatory by its use of the word "shall."  Motion at 10 (citing Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 922 F. Supp. 2d at 443).  "The difference between a mandatory and permissive forum selection clause is that '[m]andatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum.'"  Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc., 428 F.3d 921, 926 (10th Cir. 2005).  "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere."  Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc., 428 F.3d at 926-27 (citation omitted).  In K & V Scientific Co. v. BMW, the Tenth Circuit adopted the majority rule for enforcing forum-selection clauses.  See 314 F.3d at 500.  Specifically, it concluded that, when venue is specified, such as when the parties designate a particular county or tribunal, and the mandatory or obligatory language accompanies the designation, a forum-selection clause will be enforced as mandatory.  See K & V Sci. Co. v. BMW, 314 F.3d at 499.

Although the Tenth Circuit has said the use of the word "shall" generally indicates a mandatory intent, unless a convincing argument to the contrary is made, Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346, "shall" does not automatically render a forum-selection clause mandatory.  Courts should resolve any ambiguity whether a forum-selection clause is mandatory or permissive by construing the language against the drafter.  See K & V Sci. Co. v. BMW (citing Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346).  The K & V Scientific Co. v. BMW court offered examples of permissive forum-selection clauses that use "shall":

> * "The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract."  Hunt Wesson Foods, Inc. v. Supreme Oil Co., 817 F.2d 75, 76 (9th Cir. 1987).

> \* "This agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York."   Keaty [v. Freeport Indon., Inc.], 503 F.2d at 956 (concluding phrase was ambiguous and, when construed against drafter, was permissive).

K & V Scientific Co. v. BMW, 314 F.3d at 499.  In the first example, "shall" refers to the "courts of California, County of Orange" as having jurisdiction over related litigation and not that related litigation "shall" be brought in those courts.  In Keaty v. Freeport Indon., Inc., "shall" refers to New York laws governing the agreement, but fails to clearly indicate that the binding nature of "shall" extends to the parties submitting to New York courts' jurisdiction.  By contrast, the use of "shall" in the following excerpt was found to be unambiguously mandatory:

> \* Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia.  Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia."   Docksider[, Ltd. v. Sea Tech., Ltd.,] 875 F.2d at 763.

K & V Scientific Co., Inc. v. BMW, 314 F.3d at 499-500 (footnote omitted).  In that example, the word "shall" is used in reference to "action[s] brought hereunder" as needing to be brought in Gloucester County.

> Here, the forum-selection clause is mandatory:
>
> This Broker-Dealer Agreement shall be governed by and construed in accordance with the laws of the State of New York (including, without limitation, Section 5-1401 of the New York General Obligations Law or any successor to such statute).  The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court.  Each of the parties hereto also irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of this Broker-Dealer Agreement or the transactions contemplated hereby.

Broker-Dealer Agreement at 14 (emphasis added).  This language parallels structure of the clause in Docksider, Ltd. v. Sea Technology, Ltd. in that "shall" refers to the "actions and

proceeding" having to be brought in a certain forum, and not that a certain forum "shall" have jurisdiction.

## IV. WHILE THE FORUM-SELECTION CLAUSE DOES NOT BIND THE NMHELC, THE COURT WILL TRANSFER THE ENTIRE CASE TO THE SOUTHERN DISTRICT OF NEW YORK IN THE INTERESTS OF CONVENIENCE AND JUSTICE.

Presbyterian Healthcare argues that the Court cannot compel the NMHELC to litigate in the Southern District of New York, because NMHELC is not a signatory to the Broker-Dealer Agreement. See Response at 21-22. While the Court can find no cases in its own history or in the Tenth Circuit considering this issue, district courts elsewhere in the Tenth Circuit and in other Circuits have found that a non-signatory can be subject to a forum-selection clause if the connection between the agreement and the non-signatory is sufficiently strong -- i.e., if the party is "'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." Hugel v. Corp. of Lloyd's, 999 F.2d 206, 209 (7th Cir. 1993).  See, e.g., Manetti-Farrow, Inc. v. Gucci Am., Inc., 858 F.2d 509, 514 n.5 (9th Cir. 1988)("[T]he alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants."); Mozingo v. Trend Pers. Servs., No. CIV 10-4149 JTM, 2011 WL 3794263, at *6 (D. Kan. Aug. 25, 2011)(applying the closeness standard while noting that "[t]he Tenth Circuit has not explicitly held that non-signatories may be bound by a forum selection clause"), aff'd, 504 F. App'x 753 (10th Cir. 2012).  Under this standard, courts have, for example, applied forum-selection clauses to "corporations owned and controlled" by the signatory, Hugel v. Corp. of Lloyd's, 999 F.2d at 210, the contract's third-party beneficiaries, Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d at 203, and, when the signatory is a company, to its officers and directors, see Marano Enters. of Kan. v. Z-Teca Rest., L.P., 254 F.3d 753, 757 (8th Cir. 2001), and other companies that share officers and directors, LaRoss Partners, LLC v.

- 81 -

Contact 911, Inc., 874 F. Supp. 2d 147, 160-61 (E.D.N.Y. July 10, 2012).  As a general

approach,

> courts considering this question of whether a non-signatory may be bound by a
> forum selection clause take a common sense, totality of the circumstances
> approach that essentially inquires into whether, in light of those circumstances, it
> is fair and reasonable to bind a non-party to the forum selection clause. . . .  [T]his
> approach places emphasis on whether it should have been reasonably foreseeable
> to the non-signatory that situations might arise in which the non-signatory would
> become involved in the relevant contract dispute.

Regions Bank v. Wyndham Hotel Mgmt., Inc., No. CIV 3:09-1054, 2010 WL 908753, at *6

(M.D. Tenn. Mar. 12, 2010).

While NMHELC is undoubtedly close to Presbyterian Healthcare, pursuant to

NMHELC's role as "a political body . . . set up to help the various hospitals in New Mexico

issue bonds," Tr. at 38:17-19 (Edwards), the Court will not apply the Broker-Dealer Agreement's

forum-selection clause to NMHELC.  The Court is concerned about applying contracts and

forum selection clauses to people who did not sign the contract.  See Smith/Enron Cogeneration

Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 97 (2d Cir. 1999)("[A] court

should be wary of imposing a contractual obligation to arbitrate on a non-contracting party.");

Am. Bell Inc. v. Fed'n of Tel. Workers of Penn., 736 F.2d 879, 888 (3d Cir. 1984)("Because the

courts are reluctant to impose contractual obligations on non-signatory parties, they generally do

so only where the obligations are justified by legitimate concerns for employee welfare.").  This

concern seems particularly poignant when the non-signatory is a public agency who issues

bonds, but is not ultimately liable for the bonds; if a state agency cannot bring a case in its own

state, it needs to give up that right itself -- not have someone else give up that right on the

agency's behalf.  In any case, it is not quite true, as Presbyterian Healthcare asserts, that there is

"not one shred of evidence in front of the Court that suggests that the [NMHELC] even knew

this [Broker-Dealer Agreement] existed," Tr. at 56:8-14 (Edwards), but what evidence exists is not overwhelming.  Five days before Presbyterian Healthcare and Goldman Sachs signed the Broker-Dealer Agreement,[17] NMHELC signed the Purchase Agreement that makes four references to the upcoming Broker-Dealer Agreement,[18] see Purchase Contract at 4, 5, 6, 8.  Mere awareness that two other parties will likely enter into a contract in the future does not, in the Court's view, provide adequate justification to subject NMHELC -- a state-created instrumentality -- to that contract's forum-selection clause.[19]

The Court concludes, however, that granting Goldman Sachs' transfer request with respect to NMHELC is appropriate based on traditional § 1404(a) concerns regarding convenience and justice.  Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  Section 1404(a) vests "discretion in the district

---

[17]NMHELC and Goldman Sachs signed the Purchase Contract on May 7, 2004, Purchase Contract at 1; Presbyterian Healthcare, Wells Fargo, and Goldman Sachs signed the Broker-Dealer Agreement on May 12, 2004, Broker-Dealer Agreement at 1.

[18]"At or prior to the Closing, [Presbyterian Healthcare], the Auction Agent, Goldman Sachs & Co. and Citigroup Capital Markets, Inc. shall have executed the Broker-Dealer Agreement relating to the Bonds and the Bond Trustee. . . ."  Purchase Contract at 5 (emphasis added).

[19]The Court is uncertain whether NMHELC would be able to bring this action against Goldman Sachs on its own.  If NMHELC's claims against Goldman Sachs depended on Presbyterian Healthcare's Broker-Dealer Agreement with Goldman Sachs, then NMHELC should be subject at least to the intent of the forum-selection clause, which is that the dispute should be litigated on this issue in the Southern District of New York.  In other words, if NMHELC needs Presbyterian Healthcare as a co-plaintiff on claims based on the Broker-Dealer Agreement, and Presbyterian Healthcare can sue only in the Southern District of New York, then, for all intents and purposes, NMHELC too should sue in the Southern District of New York.  The Court lacks enough information regarding Presbyterian Healthcare's relationship with NMHELC, however, to make a definitive determination.

court to adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness."  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29 (quoting Van Dusen v. Barrack, 376 U.S. at 622).  "The statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice."  Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977.   The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations.  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29.

> Among the factors [a district court] should consider is the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d at 1516 (internal quotation marks omitted).  See Silver v. Brown, 678 F. Supp. 2d at 1204 (stating the factors that the courts consider in making a venue determination under § 1404(a)), aff'd in part, rev'd in part and remanded, 382 F. App'x 723 (10th Cir. 2010).

The "interest of justice" is a separate element of the transfer analysis that relates to the court system's efficient administration.  Van Dusen v. Barrack, 376 U.S. at 626-27.  "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each

community to the controversy." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citations omitted). The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action. Driggers v. Clark, 422 F. App'x at 749-50 (unpublished)(citing Trujillo v. Williams, 465 F.3d at 1222).

Although no party has requested that the Court sever and transfer parts of this case, a district court may sever a case under Rule 21 to "transfer one action while retaining jurisdiction over the other." Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d at 1519 (citing Wyndham Assoc. v. Bintliff, 398 F.2d 614, 618 (2d Cir. 1968)). Courts are mindful of judicial efficiency concerns, however, and might not sever and transfer a case when doing so results in two venues hearing virtually the same case based on the same set of facts. See, e.g., Gallery House, Inc. v. Yi, 587 F. Supp. 1036, 1039-40 (N.D. Ill. 1984)("When the most efficient administration of justice in a copyright infringement action compelled the continuation of the action against both defendants in a single forum, severance of the claim against one defendant as to whom transfer would have been permissible was inappropriate.").

> [T]he court must weigh carefully whether the inconvenience of splitting the suit outweighs the advantages to be gained from the partial transfer [and] should not sever if the defendant over whom jurisdiction is retained is so involved in the controversy to be transferred that partial transfer would require the same issue to be litigated in two cases.

 Liaw Su Teng v. Skaarup Shipping Corp., 743 F.2d 1140, 1148 (5th Cir. 1984), overruled on other grounds by In re Air Crash Disaster Near New Orleans, La. on July 9, 1982, 821 F.2d 1147 (5th Cir. 1987).

> When the granting of a motion to sever and transfer claims would require two separate sets of discovery proceedings with regard to events surrounding a single [event], and when the moving defendants were alleged to have acted singly and in

concert with other defendants in the commission of securities law violations, severance prior to the completion of discovery was denied.

Sec. & Exchange Comm'n v. Nat'l Student Mktg. Corp., 360 F. Supp. 284, 296 (D.D.C. 1973) (Parker, J.).

The Court agrees with the principle that it should not sever and transfer cases when the cost to judicial efficiency outweighs the benefit to the parties, particularly in light of § 1404(a)'s purpose to minimize inefficiency.  See Cont'l Grain Co. v. The FBL-585, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent.").  If the Court were to send Presbyterian Healthcare to the Southern District of New York, but keep NMHELC here in the District of New Mexico, it would be asking Goldman Sachs to defend two separate actions in two different courts based on the same set of facts.  The Court concludes that obviating whatever inconvenience NMHELC would suffer joining Presbyterian Healthcare in the Southern District of New York cannot justify the judicial inefficiency inherent in trying essentially the same case in two different forums, particularly when, in this action, both Presbyterian Healthcare and NMHELC are represented by the same counsel.  See Tr. at 58:21-24 (Edwards).

**IT IS ORDERED** that: (i) the Defendant Goldman, Sachs & Co.'s Motion to Transfer Pursuant to 28 U.S.C. § 1404(a), filed September 30, 2014 (Doc. 27), is granted; and (ii) this case is transferred to the United States District Court for the Southern District of New York.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James P. Lyle
Law Offices of James P. Lyle P.C.
Albuquerque, New Mexico

--and--

Maryellen Duprel
Duprel Law Firm
Tempe, Arizona

--and--

Samuel B. Edwards
Sheperd Smith Edwards & Kantas, LLP
Houston, Texas

     *Attorneys for the Plaintiffs*

James S. Rubin
Patricia Salazar Ives
Cuddy & McCarthy LLC
Albuquerque, New Mexico

--and--

David H. Braff
Andrew H. Reynard
Matthew A. Schwartz
Sullivan & Cromwell LLP
New York, New York

     *Attorneys for the Defendant*